William J. MILLER, Appellant,

v.

KENNEDY & MINSHEW, PROFES-
SIONAL CORPORATION a/k/a Ken-
nedy, Minshew, Campbell & Morris,
P.C., and a/k/a Kennedy, Minshew &
Campbell, P.C., and Robert Minshew,
Appellees.

No. 2–01–408–CV.

Court of Appeals of Texas,
Fort Worth.

Nov. 20, 2003.

Rehearing En Banc Overruled
July 8, 2004.

Law Office of Frederick R. Zlotucha, Frederick R. Zlotucha, San Antonio, Storey, Moore & McCally, P.C., Helen A. Cassidy, Holtz & Wright, Inc., James W. Holtz, Houston, Bourland, Kirkman, Seidler, Evans, Jay & Michel, L.L.P., David L. Evans, Fort Worth, for appellant.

Haynes and Boone, L.L.P., Karen S. Precella, Kendyl Darby, Fort Worth, Kennedy & Minshew, P.C., Jack G. Kennedy, Sherman, for appellees.

PANEL A: CAYCE, C.J.; WALKER, J.; and SAM J. DAY, J. (Retired, Sitting by Assignment).

## OPINION

JOHN CAYCE, Chief Justice.

### I. Introduction

In this fee forfeiture case, the primary issue we must decide is whether the trial court abused its discretion by ruling that no forfeiture was required where the jury found that appellees, who are attorneys, breached their fiduciary duty to their client, appellant William J. Miller; that

Miller ratified appellees' misconduct and committed fraud; and that both appellees and Miller breached their retainer fee agreement and were negligent, but only appellees suffered damages. Because we conclude that the trial court's ruling was not an abuse of discretion and that none of Miller's other complaints require a reversal of this case, we affirm the trial court's judgment.

### II. Factual and Procedural Background

In January 1994, Miller, accompanied by his accountant, contacted Robert Minshew, an attorney with the law firm of Kennedy & Minshew, P.C. (the law firm),[1] about defending Miller in a lawsuit involving a dispute over losses on a commercial building (the Snuggs matter). Miller and the law firm entered into a contingency fee agreement concerning the Snuggs matter. Minshew eventually obtained a reversal of an arbitration award of $30,000 against Miller and secured Miller's release from 90% of the debt on the building.

Meanwhile, in February 1994, Miller discussed with Minshew problems related to his ownership in and control of North Texas Communications Company, Inc. (NTCC), a telephone and cable television business. Miller was chairman of the board of NTCC. He and his wife, Terese, owned 2500 shares, or 50%, of NTCC's stock. Alvin Fuhrman, NTCC's president, and his wife owned the other 50% of the stock.

Miller was unhappy with his role in NTCC. He believed Fuhrman was "running the company like it was his own," rather than as an equal partnership, that Fuhrman was not keeping him adequately

---

1. The law firm has also been known as Kennedy, Minshew, Campbell & Morris, P.C. and Kennedy, Minshew & Campbell, P.C. We sometimes refer to Minshew and the law firm collectively as "appellees."

informed of company business, and that NTCC should have been paying dividends. Miller told Minshew that he had contemplated selling the Millers' interest in NTCC to either Fuhrman or a third party, but had not been able to negotiate an acceptable sale price. For example, a company had offered to purchase the Millers' stock for $5 million in 1992, but that deal fell apart when the company could not acquire 100% of NTCC's stock. In February 1994, Miller had also offered to sell the Millers' stock to Fuhrman for $5.5 million. Fuhrman had countered with an offer for $4,577,201, including interest, over a nine-year period, which had a cash value equivalency of approximately $3 million.

At meetings in February and December 1994, Miller and Minshew discussed Miller's concerns and what could be done to address them. There is conflicting evidence concerning what representations Minshew made to Miller during these meetings about his expertise. Miller and Fran Voth, Miller's secretary and business partner,[2] testified that Minshew said he could take care of all of Miller's problems, including getting NTCC to pay $200,000 per year in dividends, getting Miller equal control in the company, and getting Fuhrman to allow Miller's family members to work there. Miller and Voth further testified that Minshew stated he could throw NTCC into receivership anytime Miller wanted—something that was very attractive to Miller. Minshew denied representing that he had any expertise in the area of retained earnings or dividend potential, but acknowledged stating that he had experience with corporate receiverships and that he knew the threat of a receivership got everyone's attention.

By December 1994, Miller was ready to hire appellees to represent him in his dealings with NTCC, and Miller and Minshew discussed the terms of a retainer fee agreement (RFA). Although Minshew offered to work for $150 per hour, Miller insisted on a contingent fee arrangement. Thus, the compensation section of the RFA provided that, if appellees were "instrumental" in obtaining a sale of the Millers' NTCC stock to Fuhrman or a third party on terms and conditions acceptable to the Millers, appellees would receive a fee equal to 20% of the net sale proceeds, up to $500,000. The $500,000 cap was included at Miller's request. The law firm was hesitant to agree to a contingent rather than an hourly fee because a forced sale might never occur for reasons unrelated to the law firm's work or the possibility of the sale itself. Consequently, Miller agreed to a section providing for the transfer of eighty shares of the Millers' stock to the law firm in the event work had been performed but the stock was not sold within twelve months.

Minshew gave Miller a draft of the RFA, which Miller took home to review and discuss with Voth. The Millers kept the RFA for approximately two weeks before returning to the law firm to sign it. On January 27, 1995, after reading the agreement aloud, the Millers and the law firm executed the RFA. The Millers acknowledged in the RFA that appellees had "made no guarantees regarding the successful resolution of matters for which [they had] been retained, and all expressions relative thereto are matters of [appellees'] opinion only and shall not be considered as express or implied warranties of the outcome of any such efforts on behalf of [appellees]." Before execution of the agreement, Minshew had *never met or represented Terese Miller.*

Although the Millers employed Minshew to assist in selling the NTCC stock, they

---

**2.** Voth was present at the meetings between Minshew and Miller.

did not intend to sell the stock. Miller testified that he had no intention of selling in 1995, 1996, or 1997. He also admitted there was nothing for Minshew to do until the Millers were ready to sell. Miller failed to disclose this information to appellees and instead allowed Minshew to work on the stock sale and other matters from January 1995 through February 1998, without pay or demand for pay.

In February 1995, the Millers borrowed $100,000 from the law firm. Minshew testified that, although the loan was discussed before the RFA was signed and was secured by half of the Millers' NTCC stock, it was not a condition of the RFA. Miller testified that he doubted he would have entered the RFA if the $100,000 loan had not been "part of" the agreement because he needed some ready cash; however, there is no reference in the RFA to the loan.

The RFA contained a section entitled "Duties and Authority of Attorneys," which provided that appellees were to "perform various legal duties in carrying out the purposes and intents of this Agreement, and [were] authorized, but [were] not to be limited," to do several things, including:

1. examine all books and records of NTCC and its subsidiary and affiliated companies, including careful examination of all compensation paid to and fringe benefits received by Fuhrman and his family members;
2. examine all records and reports of NTCC and its subsidiary and affiliated companies on file with any state or federal regulatory agency;
3. take legal action, if necessary, to establish the Millers' right and authority to "effectively participate" in NTCC's business affairs and to be effectively represented by their 50% ownership in NTCC;

4. file suit, if necessary, to recover on NTCC's behalf any "unreasonable" compensation or benefits provided Fuhrman or his family; and
5. file suit, if necessary, to establish NTCC's capability to pay dividends to its shareholders.

Minshew did not personally do any of these things, but in June 1995 he hired James Keller, a CPA, to prepare a valuation of NTCC and the Millers' stock. Minshew assumed that Keller would do anything listed in the first two categories of the "Duties and Authority" section that was necessary to properly value a company; however, Keller did not know about this provision and therefore did not do everything listed in it. Keller did go to NTCC's accounting firm in the fall of 1995, where he reviewed NTCC's audit and tax files, but he did not examine any of NTCC's books and records because they were not available at the accounting firm. He then prepared a valuation of NTCC and placed a maximum value of $4.5 million on the Millers' stock.

Miller rejected Keller's stock valuation as unacceptable. Although Miller said he would suggest alternative terms for the stock sale, he did not do so. Keller also investigated the possibility of NTCC paying dividends in 1995, but Minshew did not make a demand on Fuhrman for payment of a dividend. In February 1996, however, Minshew prepared a letter to Fuhrman that addressed many of Miller's concerns and threatened a receivership. Miller told Minshew not to send the letter. After several months passed, Miller stated that NTCC was expanding its fiberoptic cable routes and that, as a result, he preferred not to strap the company for cash through a forced stock buyout.

By September 1996, the Millers still had not authorized any action on the potential

sale of their NTCC stock. Consequently, at the law firm's request, the Millers confirmed in writing that they did not want the law firm to take any action on the stock sale. Although the Millers' stock had not sold within the first twelve months after the RFA was executed, appellees did not seek to enforce the alternative compensation provision that entitled them to eighty shares of the stock.

Meanwhile, in August 1995, Miller sought a second loan from the law firm for $75,000 because he wanted to invest more money in oil leases. This loan, like the previous one, was secured by the Millers' stock in NTCC, but was unrelated to the RFA. Although the Millers became badly delinquent on both notes, the law firm never made any demand for payment or took any other action on the notes or security.

Minshew also continued to do other work for Miller. He assisted Miller in obtaining revocation of a power of attorney that Miller had executed regarding a business venture, prepared contracts for Miller regarding a pump business, assisted Miller with his problems as Mayor of the City of Muenster, recovered $80,000 for Miller from Fuhrman based on the use of NTCC money on an investment project, and helped the Millers recover $186,500 in payments from NTCC or its subsidiary. Miller did not offer to pay Minshew anything for his services in 1995, 1996, or 1997 because Miller considered him to be working on a contingency fee basis.

Terese Miller passed away in January 1997. At a board of directors' meeting in April 1997, Miller was reminded that he would need legal proof of who had the right to vote Terese's stock by the annual shareholders' meeting in September, or he would not be allowed to vote Terese's stock at that meeting. The minutes from the April meeting were read and approved at the May 1997 board of directors' meeting, at which Miller was present.

Minshew eventually learned of Terese's death from a third party. He knew that Miller could not vote Terese's stock until it was transferred to him. In June 1997, Minshew offered to handle the probate of Terese Miller's estate so that unclear ownership of her stock would not preclude or delay sale of the stock when Miller decided to sell it. In July, Miller provided Minshew Terese's will to probate and said he wanted to pursue the stock sale. In the inventory and appraisement that Minshew prepared and filed in probate, Miller valued the 2500 shares of NTCC stock at $6 million.

In late May or early June 1997, Miller became angry with Fuhrman and instructed Minshew to "throw the company into receivership immediately." On August 22, 1997, Minshew, with Miller's approval, sent Fuhrman a letter demanding $9,600,000 in cash or a $10,600,000 term price for the Millers' 50% stock interest. Alternatively, the letter threatened a receivership proceeding against NTCC.

Also in August 1997, Miller asked appellees for help in obtaining a $550,000 bank loan, part of which he intended to use to pay off his indebtedness to appellees. Minshew referred Miller to American Bank of Texas and talked with the loan officers there about the value of and ongoing efforts to sell Miller's NTCC stock. In order to induce the bank to make the loan to Miller, appellees agreed to subordinate their security interest in Miller's NTCC stock to the bank's interest. In return, the bank agreed to withhold approximately $220,000 in disbursements from the loan to pay off Miller's notes and accrued interest to appellees.

In a financial statement furnished to the bank, Miller valued the NTCC stock at $7

million. During the loan application process, the bank's vice president, Howard Manning, reviewed the RFA, which Miller had provided him, and pointed out that if the stock sold, Miller would owe appellees 20% of the sale price up to $500,000. Miller acknowledged this provision in the RFA, but told Manning he was not going to pay appellees that much money.

On the afternoon of September 2, 1997, Miller called and asked Minshew to meet him at NTCC. Minshew had not read NTCC's bylaws or the minutes from its board meetings, so he was unaware that NTCC's annual shareholders' meeting was scheduled for September. Minshew assumed that the purpose of the meeting was to discuss the August 22 letter; however, he learned upon arrival that NTCC's annual shareholders meeting was scheduled for that evening. Miller was not allowed to vote Terese's stock at the meeting because it had not yet been transferred to him in the probate proceeding. As a result, the composition of NTCC's board changed so that it was stacked against Miller. At the meeting, Minshew threatened NTCC with litigation, and Fuhrman offered to buy the Millers' stock for $5 million to avoid litigation. When Miller did not accept Fuhrman's $5 million offer, Minshew suggested an independent appraisal, to which Fuhrman agreed.

After the shareholders' meeting, Minshew told Miller that the "worst case scenario" as a result of the realignment of NTCC's board was that it might delay for one year Miller's ability to throw the company into receivership. Minshew explained that it is much harder to force a company into receivership if there is no deadlock within the board of directors. Minshew believed that a sale of Miller's stock could be achieved without a receivership, however, because of Fuhrman's desire to avoid litigation and purchase Mil-

ler's stock. Miller had lost all confidence in Minshew because of the shareholders' meeting; nonetheless, he continued to seek legal services from appellees.

Minshew began working with Fuhrman's attorney to obtain an independent appraisal of the stock, and the attorneys located and agreed upon an independent appraiser. Meanwhile, Fuhrman asked Cathey, Hutton, and Associates, a telecommunications management consulting firm, to prepare a valuation of NTCC. Based on that valuation, Fuhrman raised his offer for Miller's stock to $6 million. Miller did not accept the offer.

In late January 1998, while Minshew worked to obtain the independent appraisal, Miller tentatively agreed to sell his NTCC stock to a Mr. Flusche for a purported $6.5 million, which included a $200,000 loan. Miller asked the law firm to review the contracts that he planned to execute the next morning. Minshew worked late into the night to review the documents and discovered that the structure of the deal could have resulted in Miller's loss of his stock for only $200,000. The next morning, Minshew faxed Miller a four-page document outlining why Miller should not consummate the sale and then spoke with him by telephone. Miller explained that he needed $200,000 cash that day. Minshew advised Miller that, if he needed the $200,000 immediately, he should ask Fuhrman to buy the stock for $6 million and pay $200,000 up front.

After the discussion with Minshew, Miller agreed to sell his stock to Fuhrman for $6 million, including $200,000 cash "up front" and $800,000 cash at closing. The deal closed on February 13, 1998. In a state inheritance tax return later prepared by Miller's CPA, Miller reported that he had sold his stock in an "arms length" transaction for $6 million.

After the February 1998 closing, the law firm requested in writing that Miller pay the contingency fee as provided by the RFA. Miller initially agreed to pay the fee after he received his second million-dollar payment from Fuhrman. Shortly thereafter, however, Miller stated that he would not pay the $500,000. Instead, he offered to pay Minshew only on an hourly basis.

Minshew prepared the federal estate tax return for Terese Miller's estate, and Miller signed it on June 11, 1998. Six days earlier, on June 5, Miller had filed the underlying lawsuit. Miller sued appellees for breach of contract, legal malpractice and negligence, breach of fiduciary duty, fraud, and DTPA violations. Appellees counterclaimed for breach of contract, fraud, and to recover their unpaid attorney's fees.

After a jury trial, the jury found in favor of Miller on his breach of fiduciary duty, negligence, DTPA violations, and breach of contract claims, but that Miller had suffered no damages as a result of the alleged conduct underlying these claims. On appellees' counterclaims, the jury found that Miller had breached the RFA and committed fraud and that Minshew and the law firm had suffered $500,000 in damages as a result of the breach and $500,000 in damages as a result of the fraud. The jury found, however, that some or all of appellees' claims for damages were barred by appellees' breach of their fiduciary duty to Miller. Finally, the jury found that Minshew was instrumental in obtaining the sale of Miller's NTCC stock on terms and conditions that were acceptable to Miller and that appellees were entitled to recover $500,000 from Miller as a result.

Based on the jury's verdict, the trial court rendered a take-nothing judgment for Miller and a judgment for appellees for $500,000, plus pre- and post-judgment in-terest and attorney's fees. This appeal followed.

## III. Issues on Appeal

Miller complains that the trial court's judgment is erroneous because:

- the RFA was invalid;
- the RFA and appellees' attorney's fees were unreasonable;
- the trial court abused its discretion by concluding that no fee forfeiture was required under the facts of this case;
- appellees' recovery under the RFA is barred by their prior material breaches of the RFA;
- the trial court improperly construed the "Duties and Authority of Attorneys" section of the RFA;
- appellees waived their right to compensation under the RFA;
- Miller did not ratify appellees' failure to comply with the RFA or their wrongful acts;
- Miller did not commit fraud;
- the jury charge did not comply with the evidence;
- the trial court abused its discretion by allowing two undesignated defense experts to testify at trial;
- Miller is entitled to recoup from appellees the interest he paid on the two loans that they made to him; and
- Miller is entitled to recover attorney's fees based on the jury's breach of contract and DTPA findings.

## IV. Invalidity of RFA

In the first issue raised in his opening brief, Miller contends that the RFA was invalid as a matter of law because it was "legally unconscionable," "unethical," and "unenforceable" for various reasons. Miller abandons this position in his reply brief, however, asserting instead that "[t]he *standard for fee disputes in civil*

*litigation is reasonableness* " and that the unconscionability standard applies only to situations involving disciplinary matters. Accordingly, we will not address Miller's invalidity arguments.

## V. Reasonableness of RFA and Attorney's Fee

■ Miller contends the $500,000 judgment for appellees is erroneous because there is no evidence that the RFA or appellees' fee was fair and reasonable.[3] Although no jury issue was submitted on the fairness and reasonableness of the RFA, the jury was specifically instructed in the court's charge that appellees had the burden to prove that the RFA was fair and reasonable. We must assume that the jury properly followed this instruction.[4]

In determining a "no-evidence" issue, we are to consider only the evidence and inferences that tend to support the finding and disregard all evidence and inferences to the contrary.[5] Anything more than a scintilla of evidence is legally sufficient to support the finding.[6] More than a scintilla of evidence exists if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about the existence of a vital fact.[7]

■ When an attorney-client relationship exists at the time a fee agreement is made, a rebuttable presumption of unfairness or invalidity attaches to the agreement, and the attorney has the burden of proving its fairness and reasonableness.[8] Whether the fee agreement is fair and reasonable is judged at its inception.[9] Factors to be considered in determining reasonableness include, but are not limited to:

1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

2) the likelihood ... that the acceptance of the particular employment will

3. Miller also asserts that the judgment is erroneous because appellees did not plead that their fee was reasonable or submit a jury issue on reasonableness. Miller does not, however, direct us to any place in the record where this complaint was raised in the trial court, and our review of the record has revealed none. Therefore, this argument is waived, and we will not consider it. *See* Tex.R.App. P. 33.1(a); *Bushell v. Dean*, 803 S.W.2d 711, 712 (Tex.1991) (op. on reh'g); *see also Rogers v. Stell*, 835 S.W.2d 100, 101 (Tex.1992) (holding that complaint on appeal must be the same as that presented in the trial court).

4. *See Turner, Collie & Braden, Inc. v. Brookhollow, Inc.*, 642 S.W.2d 160, 167 (Tex.1982).

5. *Bradford v. Vento*, 48 S.W.3d 749, 754 (Tex. 2001); *Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex.1996); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

6. *Cazarez*, 937 S.W.2d at 450; *Leitch v. Hornsby*, 935 S.W.2d 114, 118 (Tex.1996).

7. *Rocor Int'l, Inc. v. Nat'l Union Fire Ins. Co.*, 77 S.W.3d 253, 262 (Tex.2002).

8. *Archer v. Griffith*, 390 S.W.2d 735, 739 (Tex. 1964); *accord Keck, Mahin & Cate v. Nat'l Union Fire Ins. Co.*, 20 S.W.3d 692, 699 & n. 3 (Tex.2000); *Honeycutt v. Billingsley*, 992 S.W.2d 570, 582 (Tex.App.-Houston [1st Dist.] 1999, pet. denied) (op. on reh'g). Appellees argue that Miller, not appellees, had the burden to prove the fairness and reasonableness of the RFA because there was no attorney-client relationship between them and Miller regarding NTCC at the time the RFA was executed. Appellees did not, however, object to the trial court's instruction on these grounds; therefore, this argument is waived. *See* Tex.R.App. P. 33.1(a); *Rogers*, 835 S.W.2d at 101. Further, we note that the evidence shows that Miller and appellees' attorney-client relationship regarding NTCC began in February 1994, when Miller first discussed with Minshew his problems related to NTCC.

9. *Archer*, 390 S.W.2d at 740.

preclude other employment by the lawyer;

 3) the fee customarily charged in the locality for similar legal services;

 4) the amount involved and the results obtained;

 5) the time limitations imposed by the client or by the circumstances;

 6) the nature and length of the professional relationship with the client;

 7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

 8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.[10]

In this case, the record contains the following evidence of the fairness and reasonableness of the RFA and appellees' attorney's fee:

### A. Fee customarily charged

■ Frank Douthitt, an experienced trial lawyer, a former general counsel for the State Bar of Texas, and a former state district judge, testified that a 20% contingent fee was less than a typical contingent fee. Douthitt explained that a contingent attorney fee could range from twenty-five to fifty percent, but that the most common contingent fee was one-third. In addition, Miller himself insisted on contracting for a contingent fee, rather than an hourly one, and negotiated the $500,000 cap on the fee for the stock sale.

### B. Uncertainty of collection

Douthitt opined that there was "certainly nothing unreasonable or unethical"

about the RFA and that appellees "got the short end of the deal" because Miller had the right to refuse to sell his stock, in which case there would be no fee. Indeed, the 20% contingent fee with the $500,000 cap was not triggered unless and until Miller decided to sell his stock—something he did not intend to do when he entered the RFA and did not do for several years. Even the eighty-share alternative compensation provision did not eliminate the risk of nonpayment. Had it been enforced, appellees would have recovered only $192,-000—if they had sold the eighty shares to Fuhrman on the same terms as Miller—and they would have been required to provide another three years' legal services at no charge.[11]

### C. Time and labor required; Amount involved and results obtained

The law firm was hired to represent the Millers "in all matters relating to the affairs of [NTCC] and its affiliated and subsidiary companies," but appellees' compensation was tied primarily to their being "instrumental" in obtaining a sale of the Millers' stock on terms acceptable to them or their obtaining dividends for the Millers. Miller implies that appellees drafted the RFA in this way so that a minimal amount of work under the agreement would entitle them to their fee. This argument ignores the fact that Minshew offered to work for an hourly fee and that it was Miller, not appellees, who insisted on the contingent fee arrangement. Further, Minshew anticipated that obtaining a forced sale of the Millers' stock might not occur at all. Indeed, the RFA itself contemplated that the stock sale might not

---

10. Tex. Disciplinary R. Prof'l Conduct 1.04(b), *reprinted in* Tex. Gov't Code Ann., tit. 2, subtit. G app. A (Vernon 1998) (Tex. State Bar R. art. X, § 9); *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex.1997).

11. We do not consider whether the eighty-share alternative compensation provision was fair and reasonable because appellees never sought to enforce the provision.

occur for a year or more despite appellees' provision of legal services. Finally, the RFA obligated appellees to represent the Millers in "all matters" relating to NTCC, even though only certain legal services would entitle them to any compensation.

■ This evidence is more than a scintilla of evidence that the RFA and the $500,000 contingent fee provision were fair and reasonable when the RFA was executed.[12] We overrule Miller's first issue.

## VI. Fee Forfeiture

In his second and fourth issues, Miller contends that, in light of the evidence supporting the jury's findings on Miller's claims against appellees and the evidence that appellees improperly loaned Miller money, the trial court abused its discretion by concluding that no fee forfeiture was required in this case.

■ "A lawyer engaging in clear and serious violation of duty to a client may be required to forfeit some or all of the lawyer's compensation for the matter."[13] Fee forfeiture is an equitable remedy whose primary purpose is not to compensate the injured client, but to protect the relationship of trust between attorney and client by discouraging attorney disloyalty.[14] Forfeiture is not justified in each instance in which a lawyer violates a legal duty; some violations are inadvertent or do not significantly harm the client.[15] Thus, the remedy is restricted to "clear and serious" violations of duty.[16]

■ Whether a fee forfeiture should be imposed must be determined by the trial court based on the equity of the circumstances.[17] Certain matters, however, are fact issues for the jury to decide.[18] Such issues include but are not limited to whether or when the alleged misconduct occurred, the attorney's mental state and culpability, the value of the attorney's services, and the existence and amount of harm to the client.[19]

■ Once the necessary factual disputes have been resolved, the trial court must determine whether the attorney's conduct was a clear and serious breach of duty to his client, whether any of the attorney's compensation should be forfeited, and if so, the amount.[20] Factors the

12. In one sentence, Miller contends that the jury's breach of fiduciary duty finding "effectively negates" the jury's finding that the RFA was fair and reasonable. We do not address this argument because it is not briefed. *See* TEX.R.APP. P. 38.1(h); *see also Fredonia State Bank v. Gen. Am. Life Ins. Co.*, 881 S.W.2d 279, 284 (Tex.1994) (noting that argument may be waived due to inadequate briefing). In addition, because there is some evidence that the RFA and appellees' fee were reasonable, we need not reach Miller's assertion that the contractual and fraud damages cannot be upheld on the ground that there is no evidence of the fee's fairness and reasonableness. *See Cazarez*, 937 S.W.2d at 450; *Archer*, 390 S.W.2d at 740.

13. *Burrow v. Arce*, 997 S.W.2d 229, 241 (Tex. 1999) (quoting RESTATEMENT (THIRD) OF LAW GOVERNING LAWYERS § 37 (2000)).

14. *Id.* at 238, 245.

15. *Id.* at 241.

16. *Id.;* RESTATEMENT (THIRD) OF LAW GOVERNING LAWYERS § 37 & cmt. d.

17. *Burrow*, 997 S.W.2d at 245; *State v. Tex. Pet Foods, Inc.*, 591 S.W.2d 800, 803 (Tex. 1979).

18. *Burrow*, 997 S.W.2d at 245–46; *see also Tex. Pet Foods*, 591 S.W.2d at 803 (stating that, in an equitable proceeding, "ultimate issues of fact are submitted for jury determination").

19. *Burrow*, 997 S.W.2d at 246.

20. *Id.*

trial court is to consider in making these determinations include the adequacy of other remedies, the weight to be given all other relevant issues, and, most importantly, whether forfeiture is necessary to satisfy the public's interest in protecting the integrity of the attorney-client relationship.[21]

 We review the trial court's fee forfeiture determination under an abuse of discretion standard.[22] A trial court does not abuse its discretion unless it acts arbitrarily or unreasonably, without reference to any guiding rules or principles.[23] Merely because a trial court may decide a matter within its discretion in a different manner than an appellate court would in a similar circumstance does not demonstrate that an abuse of discretion has occurred.[24] We may not substitute our judgment for the trial court's unless the trial court's action was so arbitrary that it exceeded the bounds of reasonable discretion.[25]

Legal and factual sufficiency are relevant factors to be considered in assessing whether the trial court abused its discretion.[26] An abuse of discretion does not occur, however, where the trial court bases its decisions on conflicting evidence, as long as some evidence reasonably supports the trial court's decision.[27]

 In this case, the jury made the following fact findings necessary for the trial court to determine whether appellees' fee should be forfeited:

- Appellees failed to comply with their fiduciary duty to Miller; made negligent misrepresentations to him (Minshew only); and engaged in false, misleading, or deceptive acts or practices.[28] The jury also found, however, that appellees committed no willful misconduct—no fraud, no unconscionable conduct, and no knowing or intentional misconduct.[29]

- Appellees were negligent. The jury attributed 40% of the negligence to Minshew and 19% to the law firm,[30] but found that appellees were not grossly negligent.

21. *Id.* at 245–46.

22. *See id.* at 242–43; RESTATEMENT (THIRD) OF LAW GOVERNING LAWYERS § 37 cmt. b (both stating that the fee forfeiture remedy should be applied with discretion); *Jackson Law Office, P.C. v. Chappell*, 37 S.W.3d 15, 23 (Tex. App.-Tyler 2000, pet. denied) (applying abuse of discretion standard of review to trial court's fee forfeiture determination).

23. *See Carpenter v. Cimarron Hydrocarbons Corp.*, 98 S.W.3d 682, 687 (Tex.2002); *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex.1985), *cert. denied*, 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986).

24. *Downer*, 701 S.W.2d at 241–42.

25. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 211 (Tex.2002).

26. *Beaumont Bank v. Buller*, 806 S.W.2d 223, 226 (Tex.1991); *Tex. Dep't of Health v. Buckner*, 950 S.W.2d 216, 218 (Tex.App.-Fort Worth 1997, no pet.).

27. *Butnaru*, 84 S.W.3d at 211; *Davis v. Huey*, 571 S.W.2d 859, 862 (Tex.1978).

28. The jury was not asked whether appellees' loans to Miller were improper and therefore did not make a finding on that issue. Irrespective of the propriety of the loans, the evidence does not show, as Miller implies, that appellees simply waited for him to default on the loans, rather than rendering services under the RFA, because of the stock interest he had given them to secure the loans. To the contrary, in September 1996, the Millers confirmed in writing that they did not want appellees to take any action on the stock sale, and appellees never took any action against Miller on the loans, even though he became badly delinquent on both of them.

29. Conversely, the jury found that Miller committed fraud against appellees.

30. The jury attributed the remaining 41% of the negligence to Miller.

• Appellees and Miller breached the RFA, but Miller was estopped from denying that he was bound by the terms of the contract.

• Appellees' breach of their legal duty to Miller occurred early in the parties' relationship and several years before the stock sale in February 1998; Miller should have discovered appellees' breach of their fiduciary duty by January 27, 1995, which was the date the RFA was executed; and Miller should have discovered appellees' DTPA violations and negligence by October 15, 1996.

• Minshew was instrumental in obtaining a sale of Miller's NTCC stock upon terms and conditions acceptable to him, and appellees were entitled to a $500,000 fee as a result.

• Miller ratified appellees' conduct and their failure to comply with the RFA, and he was estopped from claiming that the value of his NTCC stock at the time of the stock sale was more than $6 million.

• Miller suffered no damages as a result of any of appellees' conduct.[31]

Based on these jury findings, the trial court determined that the timing of appellees' misconduct or duty violations caused Miller no significant harm and did not affect the value of appellees' work for him.[32] The trial court also concluded that appellees' misconduct or violations of duty were not clear and serious; that appellees' misconduct had no impact or effect on the public's interest in protecting the attorney-client relationship;[33] and that Miller's request for a fee forfeiture should therefore be denied.

We conclude that the jury's findings reasonably support the trial court's findings and conclusions. Thus, we hold that the trial court did not abuse its discretion in determining that no fee forfeiture was required in this case.

▇▇▇▇ Miller contends that the jury's finding that some or all of appellees' claims for damages were barred by their breach of fiduciary duty clearly shows the "public's viewpoint" that a fee forfeiture should be required in this situation. We disagree. Not every breach of fiduciary duty requires a fee forfeiture.[34] Moreover, the propriety and amount of a fee forfeiture are legal issues for the court, not the jury.[35] A jury question on a legal issue is immaterial because it calls for a finding beyond the province of the jury.[36] Therefore, both the question regarding appel-

---

31. In contrast, the jury found that appellees suffered $500,000 in damages due to Miller's breach of the RFA and $500,000 in damages because of his fraud. The jury also found that appellees had not waived their damages claims against Miller and were not estopped from asserting them.

32. Miller contends that these trial court findings are irrelevant and immaterial because only the jury can resolve factual disputes in a forfeiture proceeding. Where an abuse of discretion standard of review applies to a trial court's ruling, findings of fact and conclusions of law aid us in reviewing the propriety of the ruling by providing us with an explanation for the ruling. *Chrysler Corp. v. Blackmon*, 841 S.W.2d 844, 852 (Tex.1992); *Samuelson v. United Healthcare of Tex., Inc.*, 79 S.W.3d 706, 710 (Tex.App.-Fort Worth 2002,

no pet.). The trial court's fact findings are helpful in this case because they demonstrate how the court weighed "all other relevant considerations" to the forfeiture issue. *Burrow*, 997 S.W.2d at 245.

33. Although the trial court mislabeled some of its conclusions of law as "Findings of Fact," they are nonetheless legal conclusions on matters committed to the court's discretion. *See id.* at 246.

34. *Id.* at 241.

35. *Id.* at 246; *Jackson Law Office*, 37 S.W.3d at 23.

36. *S.E. Pipe Line Co. v. Tichacek*, 997 S.W.2d 166, 172 (Tex.1999); *Spencer v. Eagle Star Ins. Co. of Am.*, 876 S.W.2d 154, 157 (Tex. 1994).

lees' damages claims and the jury's answer to it were immaterial. Thus, to the extent that the jury's answer can be read as a finding that appellees' recovery of their fee is barred because of their breach of their fiduciary duty to Miller, the trial court properly disregarded this finding.[37]

## VII. Prior Material Breaches

 Miller contends that appellees' material breaches of the RFA excuse him from paying appellees their attorney's fees under the RFA because appellees' breaches of the RFA preceded his breach of the RFA.[38] The jury found, however, that Miller's breach of the RFA was *not* excused, and Miller does not challenge the sufficiency of the evidence to support this finding. In light of this finding and the evidence supporting it, we hold that appellees' alleged material breaches of the RFA did not preclude them from recovering their attorney's fees. We overrule Miller's second and fourth issues.

## VIII. Trial Court's Construction of the RFA

In his third issue, Miller complains that the trial court misconstrued the "Duties and Authority of Attorneys" section of the RFA by ruling that this section did not impose any contractual duties on appellees.[39] Miller asserts that the trial court's erroneous construction prevented him from fully presenting his case to the jury because it precluded him from putting on evidence that appellees' failure to do the things listed in the "Duties and Authority" section proximately caused his breach of contract damages. Miller also argues that the trial court's ruling prohibited the jury from finding that he suffered damages as a result of appellees' breach of the RFA.

The parties agreed that the RFA was unambiguous, so the trial court construed it as a matter of law.[40] Miller did not object during trial to the trial court's construction of the "Duties and Authority" section. As a result, his complaints regarding the trial court's construction of this section are waived.[41] We overrule Miller's third issue.

## IX. Waiver of Compensation

In his fifth issue, Miller contends that appellees are precluded, as a matter of law, from recovering damages under the

---

**37.** *See S.E. Pipe Line Co.*, 997 S.W.2d at 172; *Great Am. Prods. v. Permabond Int'l*, 94 S.W.3d 675, 682 (Tex.App.-Austin 2002, pet. denied). Even assuming the jury's breach of fiduciary duty findings were material to the trial court's fee forfeiture determination, the jury was asked only whether appellees' damages claims were barred, not whether appellees should be required to forfeit their fee. Indeed, in response to a different question, the jury found that appellees were entitled to recover $500,000 from Miller as a result of being instrumental in obtaining a sale of his stock upon terms and conditions acceptable to him.

**38.** Generally, a party's breach of mutually dependent, reciprocal promises in a contract excuses performance by the other party. *Hanks v. GAB Bus. Servs., Inc.*, 644 S.W.2d 707, 708 (Tex.1982); *Shaw v. Kennedy, Ltd.*, 879 S.W.2d 240, 247 (Tex.App.-Amarillo 1994, no writ). Treating a contract as continuing after a breach, however, deprives the nonbreaching party of any excuse for terminating his own performance. *Hanks*, 644 S.W.2d at 708; *Chilton Ins. Co. v. Pate & Pate Enters., Inc.*, 930 S.W.2d 877, 888 (Tex.App.-San Antonio 1996, writ denied).

**39.** *See supra* at part II for the contents of this section.

**40.** *See MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 650 (Tex.1999); *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983).

**41.** *See* Tex.R.App. P. 33.1(a); *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex.), *cert. denied*, 530 U.S. 1244, 120 S.Ct. 2690, 147 L.Ed.2d 962 (2000).

RFA because they waived their right to compensation under the RFA. The jury found, however, that appellees did *not* waive their claims for damages against Miller and were not estopped from asserting those claims. Miller does not challenge these findings. Instead, he asserts that, because appellees waived their right to eighty shares of the Millers' stock under the alternate compensation provision in paragraph (c) of the RFA, they waived any rights they may have had to contractual compensation as a matter of law. This argument is premised entirely upon Miller's contention that "[p]roper construction" of compensation paragraphs (a) and (c) "confirms that they are mutually exclusive."[42] Miller offers no explanation for this assertion, and we are unable to discern why he believes the paragraphs are mutually exclusive. Because this argument is not adequately briefed, Miller's fifth issue is overruled.[43]

## X. Miller's Ratification of Appellees' Actions

In his sixth issue, Miller challenges the legal and factual sufficiency of the evidence to support the jury's ratification findings.[44] In addition, Miller asserts that the trial court should have disregarded the jury's ratification findings because they irreconcilably conflict with the findings that appellees breached their fiduciary duty to Miller and engaged in false, misleading, or deceptive acts or practices, and because the ratification defense is not available where a breach of fiduciary duty has occurred. We will address these arguments in turn.

A person ratifies an unauthorized act if, by word or conduct, with knowledge of all material facts, he confirms or recognizes the act as valid.[45] Ratification may be inferred by a party's

42. Compensation paragraph (a) provided:
 In the event that actions of attorneys are instrumental in obtaining a sale of Clients' shares to Fuhrman or to a third party, upon terms and conditions acceptable to Clients, Attorneys shall receive[ ] a fee equal to 20%, not to exceed $500,000.00, of the net proceeds to be received by Clients from such sale, to be paid by Clients to Attorneys if and when received by Clients.
 Compensation paragraph (c) provided:
 In the event that Attorney's services are rendered as set forth above, but do not result in a sale of Clients' stock on terms and conditions acceptable to Clients ... Clients agree to assign eighty shares of stock in [NTCC] to Attorneys in return for which Attorneys agree to continue to represent Clients in all legal matters relating to the affairs of [NTCC] and all other personal legal matters, without additional fee, for a period of three (3) years from and after the date of such transfer of stock. The obligation to transfer stock in accordance with the provision of this paragraph shall arise if and only if Clients['] shares have not been sold as set forth above within twelve (12) months from the date hereof.

43. Because Miller has waived his argument that appellees waived their right to compensation under the RFA, we do not address Miller's related arguments that appellees breached their fiduciary duty by waiving their right to compensation in the form of stock in order to "gain the economic advantage of obtaining a greater fee" and by failing to disclose their waiver to Miller.

44. Miller also complains that the jury questions on ratification did not properly define ratification because the trial court did not instruct the jury that Miller was required to have full knowledge of all material facts. This complaint is waived because Miller did not raise it at the charge conference. *See* Tex.R.App. P. 33.1(a); *Osterberg*, 12 S.W.3d at 55.

45. *Mo. Pac. R.R. Co. v. Lely Dev. Corp.*, 86 S.W.3d 787, 792 (Tex.App.-Austin 2002, pet. dism'd); *Garrison Contractors, Inc. v. Liberty Mut. Ins. Co.*, 927 S.W.2d 296, 302 (Tex.App.-El Paso 1996), *aff'd*, 966 S.W.2d 482 (Tex. 1998).

course of conduct and need not be shown by express word or deed.[46] Ratification may also occur when a principal retains the benefits of a transaction after acquiring full knowledge of his agent's unauthorized act.[47] The critical factor is the principal's knowledge of the transaction and his actions in light of such knowledge.[48]

In this case, the jury found that Miller ratified appellees' "failure to comply." The jury was instructed that, for ratification of appellees' failure to comply to occur, Miller had to continue to accept benefits under the RFA after he became aware of the failure to comply, with full knowledge of the failure to comply at the time of the ratification and with intent to ratify the RFA in spite of the failure to comply.

The jury also found that Miller ratified appellees' "conduct." The jury was instructed that, for ratification of appellees' conduct to occur, Miller had to continue to accept benefits under the RFA after he became aware of the misrepresentations, or to recognize the RFA as binding, with full knowledge of the misrepresentations at the time of the ratification and with intent to ratify the RFA in spite of the misrepresentations.

 Miller testified that, when he learned at the September 1997 shareholders' meeting that he could not vote Terese's stock, he "lost all confidence" in Minshew because "he didn't take care of me. Everything that he promised me before, why, it was out the window." Miller contends that, at that time, he decided he was not going to pay appellees for their services under the RFA because "they hadn't earned it."

After the September 1997 meeting, however, Miller allowed Minshew to continue to attempt to obtain an independent appraisal of his NTCC stock, asked Minshew to review his agreement to sell his stock to Mr. Flusche, and, based on Minshew's advice against the Flusche deal, decided to sell his stock to Fuhrman instead for an arrangement that involved the immediate cash that Miller claimed he needed. Minshew testified that the closing on the sale of Miller's stock to Fuhrman was "a pretty festive occasion," that Miller was very happy, and that he shook Minshew's hand and thanked him. After the closing, appellees asked Miller to pay the $500,000 contingency fee as provided by the RFA. Miller initially agreed to pay the $500,000 fee after he received his second million-dollar payment from Fuhrman. It was only later that Miller stated he would not pay the $500,000, but instead wanted to pay only on an hourly basis.

This evidence shows that Miller continued to accept benefits under the RFA with full knowledge of appellees' unauthorized acts and that, at least initially after the stock sale occurred, he recognized the RFA as binding. Thus, we hold that the evidence is legally and factually sufficient to support the jury's findings that Miller ratified appellees' misconduct and failure to comply with the RFA.[49]

 Despite sufficient evidentiary support for the jury's ratification findings, Miller contends that these findings irreconcilably conflict with the jury's breach of fiduciary duty and DTPA findings. He asserts that the breach of fiduciary duty

46. *Mo. Pac. R.R. Co.*, 86 S.W.3d at 792.

47. *Land Title Co. of Dallas, Inc. v. F.M. Stigler, Inc.*, 609 S.W.2d 754, 756 (Tex.1980).

48. *Id.*

49. Miller's related argument that the acceptance of benefits doctrine applies to this case is waived because Miller did not request that the issue be submitted to the jury. *See* Tex.R. Civ. P. 278.

and DTPA findings were based on a finding that appellees failed to "fully and fairly disclose all important information to [him] concerning the transaction" and that he therefore could not have ratified with full knowledge of appellees' misconduct. Failure to disclose, however, was only one of several acts or omissions submitted to the jury as a basis for Miller's breach of fiduciary duty and DTPA claims.[50] The jury could have found a breach of fiduciary duty and DTPA violations based on any of the other acts or omissions, none of which conflict with the ratification findings. Moreover, the jury found that Miller should have discovered appellees' breach of fiduciary duty and DTPA violations by January 1995 and October 1996, respectively.

We must try to interpret jury findings in a manner that upholds the trial court's judgment.[51] If there is any reasonable basis upon which jury findings can be reconciled, we may not disregard them on the ground of conflict.[52] Because other grounds submitted to the jury support the breach of fiduciary duty and DTPA findings and the jury found that Miller discovered the facts that appellees allegedly failed to disclose early in the parties' relationship, we hold that there is a reasonable basis upon which the challenged findings can be reconciled. Accordingly, we overrule Miller's sixth issue.[53]

## XI. Miller's Fraud

Miller challenges the legal and factual sufficiency of the evidence to support the jury's finding that he committed fraud against appellees based on his failure to disclose a material fact.[54] Miller asserts

50. In addition to failure to disclose, five other acts or omissions were submitted to the jury in support of Miller's breach of fiduciary claim: (1) the transactions in question were not fair and equitable to him; (2) appellees did not make reasonable use of the confidence Miller placed in them; (3) appellees did not act in utmost good faith and exercise the most scrupulous honesty towards Miller; (4) appellees placed their interests before Miller's or used their position to gain a benefit for themselves at Miller's expense; and (5) appellees placed themselves in a position where their self-interests might conflict with their fiduciary obligations. In addition, the jury was instructed that appellees violated the DTPA if they represented that their services had or would have characteristics or benefits that they did not; that the services were or would be of a particular standard or quality if they were of another; or that an agreement conferred or involved rights, remedies, or obligations that it did not have or involve.

51. *First Fed. Sav. & Loan Ass'n v. Sharp*, 359 S.W.2d 902, 903 (Tex.1962); *Rice Food Mkts., Inc. v. Ramirez*, 59 S.W.3d 726, 733–34 (Tex. App.-Amarillo 2001, no pet.).

52. *Bender v. S. Pac. Transp. Co.*, 600 S.W.2d 257, 260 (Tex.1980).

53. We do not address Miller's contention that ratification is inapplicable in this case due to the jury's breach of fiduciary duty finding, because he cites no relevant authority to support his position. See TEX.R.APP. P. 38.1(h); *Fredonia State Bank*, 881 S.W.2d at 284. The sole case on which Miller relies is inapposite because it involved a breach of fiduciary finding that the agent had committed constructive fraud and had significantly benefitted from his breach at his principal's expense. See *Spangler v. Jones*, 861 S.W.2d 392, 395–96 (Tex.App.-Dallas 1993, writ denied), *disapproved on other grounds by Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507 (Tex.1998). Here, however, the jury found that *Miller* committed fraud, but that appellees did not, and that Miller was not harmed by appellees' breach of their fiduciary duty.

54. Miller's related complaints, that the fraud issue is immaterial and that the trial court should not have submitted the issue to the jury because it was not supported by appellees' pleadings, are waived because they either are inadequately briefed on appeal or were not raised at the charge conference. See TEX.R.APP. P. 33.1(a), 38.1(h); *Osterberg*, 12 S.W.3d at 55; *Fredonia State Bank*, 881 S.W.2d at 284.

that, at most, his actions amounted to a mere breach of contract, not fraud. In addition, Miller contends that the evidence does not support the damages award for fraud.

A person commits fraud if he (1) makes a false, material misrepresentation (2) that he either knows to be false or asserts recklessly without knowledge of its truth (3) with the intent that it be acted upon, (4) and the person to whom the misrepresentation is made acts in reliance upon it (5) and is injured as a result.[55] A misrepresentation may consist of the concealment or nondisclosure of a material fact when there is a duty to disclose.[56] The duty to disclose arises when one party knows that the other party is ignorant of the true facts and does not have an equal opportunity to discover the truth.[57] A fact is material if it would likely affect the conduct of a reasonable person concerning the transaction in question.[58]

The record shows that Minshew offered to work for an hourly fee, but Miller insisted on a fee arrangement that was contingent, in large part, upon appellees being instrumental in obtaining a sale of the Millers' NTCC stock on terms and conditions acceptable to them. The $500,000 cap on the contingent fee was included in the RFA at Miller's request. When the parties entered into the RFA in January 1995, however, Miller had no intention of selling his stock. Indeed, Miller testified that he had no intention of selling in 1995, 1996, or 1997. Minshew, on the other hand, believed that Miller desired to pursue a forced buyout of the stock from December 1994 forward. Based on the RFA, Minshew rendered Miller legal services on the stock sale and other matters from January 1995 through February 1998, without pay or demand for pay. In addition, appellees never attempted to enforce the alternative compensation provision in the RFA that entitled them to eighty shares of Miller's stock if the stock did not sell within a year.

Miller testified that he never offered to pay for Minshew's services "[b]ecause it was a contingency basis." Miller told a bank loan officer, however, that he did not intend to perform the $500,000 contingency provision in the RFA.

This evidence shows that Miller induced appellees to enter into the $500,000 contingent fee provision in the RFA by withholding from them the fact that he had no intention of doing the very thing that would give rise to his contractual duty to perform under that provision—sell his NTCC stock. The evidence also shows that appellees reasonably relied on Miller's failure to disclose in entering into the RFA and that the bulk of the work they performed under the RFA for three years was done in reliance upon it. After Miller's

---

55. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 47–48 (Tex.1998); *State Nat'l Bank v. Farah Mfg. Co.*, 678 S.W.2d 661, 681 (Tex.App.-El Paso 1984, writ dism'd by agr.).

56. *Custom Leasing, Inc. v. Tex. Bank & Trust Co.*, 516 S.W.2d 138, 142 (Tex.1974); *New Process Steel Corp. v. Steel Corp. of Tex., Inc.*, 703 S.W.2d 209, 214 (Tex.App.-Houston [1st Dist.] 1985, writ ref'd n.r.e.).

57. *New Process Steel Corp.*, 703 S.W.2d at 214.

58. *Custom Leasing*, 516 S.W.2d at 142. Here, the jury was instructed that Miller committed fraud if he concealed or failed to disclose a material fact within his knowledge; knowing that appellees were ignorant of the fact and did not have an equal opportunity to discover the truth; with the intent to induce appellees to take some action due to the concealment or failure to disclose; and appellees suffered injury as a result of acting without knowledge of the undisclosed fact.

stock eventually sold, he still did not pay the $500,000 fee, but offered to pay Minshew an hourly rate. Although Miller testified that he did not want to pay the $500,000 contingent fee because appellees had not earned it, the jury could have concluded, based on the evidence, that Miller had never intended to pay this fee. Thus, the evidence is legally and factually sufficient to support the jury's finding that Miller committed fraud.[59]

The evidence also supports the jury's finding that appellees were entitled to recover $500,000 as benefit-of-the-bargain damages. Benefit-of-the-bargain damages are simply the difference between the value as represented and the value received.[60] Under this measure of damages, the defrauded party may recover lost profits that he would have made if the bargain actually struck had been performed as promised.[61] Here, the record shows that appellees would have received $500,000 if Miller had performed as promised under the RFA, but that Miller paid nothing.[62] Thus, Miller's evidentiary challenge to the jury's damages award for fraud fails. We overrule Miller's arguments concerning the jury's fraud findings.

## XII. Jury Charge

### A. Excuse

In his seventh issue, Miller complains about several parts of the charge. Miller first challenges the jury question on whether he or appellees were excused from failing to comply with the RFA. The jury was instructed that failure to comply with the RFA was excused if Miller waived compliance with the RFA, if Miller committed fraud upon which appellees relied, or if the parties had agreed that a new term would take the place of the breached term. Miller requested an additional instruction that his failure to comply was excused if appellees waived compliance with the RFA or if appellees committed fraud upon which Miller relied. The trial court denied this request, and the jury found that none of the parties' conduct was excused.

Miller asserts that the trial court's overruling of his requested instruction was reversible error because the instruction given misled the jury by not instructing them how his failure to comply with the RFA could be excused. We disagree. The jury was instructed that Miller's breach of the RFA was excused if the parties had agreed that a new term would take the

59. See Mar. Overseas Corp. v. Ellis, 971 S.W.2d 402, 406 (Tex.), cert. denied, 525 U.S. 1017, 119 S.Ct. 541, 142 L.Ed.2d 450 (1998); Cazarez, 937 S.W.2d at 450.

60. Fortune Prod. Co. v. Conoco, Inc., 52 S.W.3d 671, 681 (Tex.2000); Formosa Plastics Corp., 960 S.W.2d at 49.

61. Formosa Plastics Corp., 960 S.W.2d at 50. In this case, the jury was instructed to consider the difference, if any, between the amount of contractual benefits agreed to under the RFA and the amount of contractual benefits paid.

62. Miller erroneously relies on the Texas Supreme Court's decision in Conoco for the proposition that, to recover benefit-of-the-bar-
gain damages, appellees were required to prove the bargain they would have made if they had known that Miller did not intend to pay the $500,000 fee. The plaintiff in Conoco sought, as benefit-of-the-bargain damages, lost profits for a bargain that allegedly would have been struck, but was not, due to the defendant's fraud. The supreme court held that a party may recover lost profits in that situation if there is evidence of the bargain that would have been struck had the defrauded party known the truth. Conoco, 52 S.W.3d at 681–82. We do not have the Conoco situation here; instead, appellees sought only the lost profits that they would have received if the bargain actually struck—the $500,000 contingency fee provision in the RFA—had been performed as promised.

place of the breached term. Further, the waiver and fraud grounds for excuse that Miller requested were submitted elsewhere in the charge, and the jury found against Miller on both issues. The jury found that appellees did not waive their claims for damages against Miller, that their claims against him were not barred by fraud, and that appellees did not fraudulently induce Miller to enter the RFA. Thus, assuming, for argument's sake, that the trial court's ruling, or the jury instruction as given, was improper, no reversible error occurred.[63] We overrule this argument.

## B. Estoppel

Next, Miller asserts that the trial court erred by submitting a jury question on whether he was judicially estopped from claiming that the value of his NTCC stock at the time of the February 1998 sale was more than $6 million. Miller objected to the estoppel question on the basis that he had not taken an inconsistent position against appellees in a prior judicial proceeding. "Under the doctrine of judicial estoppel ... a party is estopped merely by the fact of having alleged or admitted in his pleadings in a former proceeding under oath the contrary to the assertion sought to be made."[64] The party invoking the doctrine need not have been a party to the former proceeding.[65]

Miller's sworn statement in the inventory and appraisement that his stock was worth $6 million was made under oath in a prior judicial proceeding, and it was con-

trary to his assertion at trial that his stock was worth much more than that amount. Accordingly, the trial court did not err by overruling Miller's objection to the judicial estoppel issue. We overrule this argument.

## C. Damages

Miller also contends that trial court reversibly erred by submitting the jury instruction on breach of contract damages because the instruction improperly told the jury to consider as an element of Miller's damages the loss of his NTCC stock's fair market value as a consequence of appellees' fraud, rather than their failure to comply with the RFA. The reference to appellees' fraud was only one element of the damages instruction. The instruction also told the jury to consider two other elements of damages for Miller: (1) the difference between his financial position as a result of appellees' failure to comply with the RFA and his position if they had complied; and (2) the difference between the amount he received for his NTCC stock and the market value of his stock. Miller does not explain how, in light of the entire damages instruction, the wording of the challenged element probably caused the rendition of an improper judgment.[66] Accordingly, we overrule this argument.

## D. Waived Complaints

Finally, Miller makes numerous complaints about the jury charge that are waived because they either were not raised at the charge conference or are inadequately briefed on appeal,[67] including:

**63.** *See* TEX.R.APP. P. 44.1(a)(1) (providing that trial court's judgment may not be reversed based on error of law unless error probably caused rendition of an improper judgment).

**64.** *Long v. Knox*, 155 Tex. 581, 291 S.W.2d 292, 295 (1956).

**65.** *Id.*

**66.** *See* TEX.R.APP. P. 44.1(a)(1).

**67.** *See* TEX.R.APP. P. 33.1(a); *Osterberg*, 12 S.W.3d at 55; *Fredonia State Bank*, 881 S.W.2d at 284.

- the doctrine of judicial estoppel does not apply to the inventory and appraisement he filed in Terese's probate proceeding—in which he swore under oath that the 2500 shares of NTCC stock were worth $6 million—because (1) appellees were responsible for preparing the inventory and "advising him in how to complete the forms," (2) due to appellees' misconduct, he was unaware of the true value of his stock when he signed the document, and (3) the inventory could be supplemented;

- the estoppel questions were immaterial because they were questions of law for the trial court to decide;

- the evidence is insufficient to support the jury's estoppel finding; [68]

- the trial court erred by submitting a jury question on whether he was *equitably* estopped from denying that he was bound by the terms of the RFA; and

- the fraud issue was immaterial and should not have been submitted to the jury because it was not supported by appellees' pleadings.

We overrule Miller's seventh issue.

## XIII. Undesignated Experts

In his eighth issue, Miller asserts that the trial court reversibly erred by allowing Alan Rohmer and Hubert G. Bares to testify regarding their valuations of NTCC because neither Rohmer nor Bares was designated as a testifying expert in appellees' response to Miller's request for disclosure.

A party may request disclosure of a testifying expert's identity, the subject matter on which the expert will testify, a summary of the expert's mental impressions and opinions, and the data that the expert reviewed in anticipation of his testimony.[69] The purpose of this pretrial disclosure rule is to give the opposing party sufficient information about the expert's opinions to prepare to cross-examine the expert and to prepare expert rebuttal evidence.[70] A party who fails to timely provide this information once it has been requested may not offer the expert's testimony unless the trial court finds that there was good cause for the failure to timely provide the information or that the failure to provide the discovery will not unfairly surprise or prejudice the other party.[71] The burden of establishing good cause or lack of unfair prejudice or surprise is on the party seeking to call the witness, and the trial court's finding of good cause or lack of prejudice or surprise must be supported by the record.[72] We review the trial court's ruling under an abuse of discretion standard.[73]

---

**68.** Miller cites neither evidence nor case law to support his evidentiary challenge. We note, however, that the same evidence that supports the jury's fraud finding is legally and factually sufficient to support an equitable estoppel finding. *See Nelson v. Jordan*, 663 S.W.2d 82, 87 (Tex.App.-Austin 1983, writ ref'd n.r.e.) (stating that elements of equitable estoppel are a false representation or concealment of material fact, made with knowledge of the facts, to a party without knowledge of or the means of knowing those facts, with the intention that it should be acted upon, and detrimental reliance by the party to whom it was made).

**69.** Tex.R. Civ. P. 194.2(f).

**70.** *Exxon Corp. v. W. Tex. Gathering Co.*, 868 S.W.2d 299, 304 (Tex.1993); *Taylor Foundry Co. v. Wichita Falls Grain Co.*, 51 S.W.3d 766, 773 (Tex.App.-Fort Worth 2001, no pet.).

**71.** Tex.R. Civ. P. 193.6(a); *VingCard A.S. v. Merrimac Hospitality Sys., Inc.*, 59 S.W.3d 847, 855 (Tex.App.-Fort Worth 2001, pet. denied) (op. on reh'g).

**72.** Tex.R. Civ. P. 193.6(b).

**73.** *Bodnow Corp. v. City of Hondo*, 721 S.W.2d 839, 840 (Tex.1986); *VingCard*, 59 S.W.3d at 855.

In this case, Rohmer was designated as a fact witness in appellees' response to Miller's disclosure request, but neither Rohmer nor Bares was listed as a testifying expert. Consequently, Miller moved to exclude Rohmer's and Bares's expert testimony.

At the hearing on Miller's motion, appellees pointed out that they had listed both Rohmer and Bares as expert witnesses on their anticipated trial witness list; Miller had deposed Bares by written questions; over a year before trial, appellees had provided Miller Bares's interrogatory responses and the written valuation of NTCC that he had prepared for Cathey, Hutton, and Associates;[74] Miller had deposed Rohmer, a NTCC employee who had also valued NTCC, over a year before trial; and Rohmer had provided Miller all of the data underlying his valuation of NTCC. Appellees argued that Miller would not be unfairly surprised by Rohmer's and Bares's testimony because he had had the substance of their testimony, as well as their discovery responses, valuations, and underlying data, for over a year and had devoted considerable expert testimony at trial to attacking their methodologies and valuations.

The trial court ruled that Rohmer and Bares could testify because of the length of time Miller had known of the substance of their testimony and because Miller's experts had devoted so much time to attacking their valuation reports. This rec-ord supports the trial court's finding that allowing Rohmer and Bares to testify would not unfairly surprise or prejudice Miller; therefore, the trial court's ruling allowing their testimony was not an abuse of discretion.[75] We overrule Miller's eighth issue.

## XIV. Recoupment of Interest

In his ninth issue, Miller contends that, as a matter of law, he is entitled to recoup the $42,000 in interest he paid to appellees on the two loans that they made to him because the loans constituted a breach of appellees' fiduciary duty.[76] Miller asserts that the loans were impermissible because they were made to induce him to enter the RFA.

There is no indication in the record that the jury's finding that appellees breached their fiduciary duty was based on the loans. None of the instructions on the breach of fiduciary duty issue mentions the loans. In addition, the jury found that Miller should have discovered appellees' breach of their fiduciary duty by January 27, 1995, which was before either loan was made. The jury also found that Miller ratified appellees' misconduct by continuing to accept benefits under the RFA. In view of these jury findings, there is no basis for awarding Miller the interest he paid on the loans; therefore, Miller is not entitled to recoup this interest from appellees.[77] We overrule this argument.

---

74. Before the stock sale, Fuhrman hired Cathey, Hutton, and Associates to prepare a valuation of NTCC. Bares prepared the valuation for Cathey, Hutton.

75. *See Carpenter*, 98 S.W.3d at 687 (stating that trial court abuses its discretion if it acts without reference to any guiding rules and principles).

76. Miller also contends that the loans violated the Texas Disciplinary Rules, but acknowl-edges that disciplinary rule violations do not constitute independent causes of action.

77. The cases on which Miller relies to support his claim for recoupment are inapposite because, unlike this case, they involved situations in which the agents secretly benefitted from the transactions they performed on behalf of their principals. *See Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 200–01 (Tex.2002); *Anderson v. Griffith*, 501 S.W.2d 695, 701–02 (Tex.Civ.App.-Fort Worth 1973,

**350**

## XV. Attorney's Fees

 Finally, Miller asserts that he is entitled to attorney's fees based on the jury's breach of contract and DTPA findings. A party is not entitled to recover attorney's fees on a breach of contract or DTPA claim absent a recovery of actual damages or something of value.[78] A plaintiff who receives nominal or zero damages is not entitled to attorney's fees.[79]

The jury did not award Miller damages or anything of value. Therefore, the trial court did not err by not awarding him attorney's fees.[80] We overrule Miller's ninth issue.

## XVI. Conclusion

Having disposed of all of Miller's issues, we affirm the trial court's judgment.

writ ref'd n.r.e.) (both holding that agent who secretly benefits from transaction performed on behalf of principal must disgorge profit).

**78.** *Gulf States Utils. Co. v. Low,* 79 S.W.3d 561, 567 (Tex.2002); *Green Int'l, Inc. v. Solis,* 951 S.W.2d 384, 390 (Tex.1997); *ITT Commercial Fin. Corp. v. Riehn,* 796 S.W.2d 248, 256 (Tex.App.-Dallas 1990, no writ).

**79.** *Low,* 79 S.W.3d at 567.

**80.** The two cases Miller cites to demonstrate that the trial court erred in not awarding him attorney's fees are not on point. In those cases, the jury findings indicated that the prevailing parties were entitled to recover something of value, even though no damages were awarded. *See Atl. Richfield Co. v. Long Trusts,* 860 S.W.2d 439, 450 (Tex.App.-Texarkana 1993, writ denied) (upholding attorney's fee award where jury found that breaching party did not owe prevailing party any money on breach of contract claim because prevailing party had been able to recoup most of its damages from breaching party while litigation was pending); *Martini v. Tatum,* 776 S.W.2d 666, 669–70 (Tex.App.-Amarillo 1989, writ denied) (upholding attorney's fee award where jury's findings indicated that prevailing party would have been entitled to recover damages, but no damages issue was submitted).