**AFFIRM, REVERSE, RENDER, and REMAND; and Opinion Filed August 8, 2013.**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-10-01133-CV**

**ELIZABETH W. CELMER, Appellant**
**V.**
**CHARLES MCGARRY, Appellee**

**On Appeal from the 101st Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-09-3023-E**

## OPINION

Before Justices O'Neill, FitzGerald, and Lang-Miers
Opinion by Justice Lang-Miers

This is a fee dispute between an attorney and his client. The case began when appellant Elizabeth W. Celmer's former spouse interpleaded funds into the registry of the trial court after the conclusion of their divorce litigation. Appellee Charles McGarry, who represented Celmer in the divorce litigation, asserted claims for breach of contract and quantum meruit against Celmer. Following a jury trial, the court rendered a judgment for McGarry after it suggested a remittitur to reduce the actual damages awarded by the jury.

### I. BACKGROUND

Before Celmer and her former spouse Edward O. Bufkin, Jr., were married, they entered into an antenuptial contract in which they agreed to their relative rights to property. *See Bufkin*

*v. Bufkin*, 259 S.W.3d 343, 348 (Tex. App.—Dallas 2008, pet. denied) (*Bufkin II*).[1]  Under the contract, all property owned before marriage or acquired during the first five years of marriage was the respective spouse's separate property.  *Id.*  The contract also provided that "a community property estate will accumulate from and after a date which is five years from the date of the marriage of the parties."  *Id.*  As interpreted by the El Paso Court of Appeals and this Court in previous appeals, the contract provided that increases in the value of separate property, as well as income accumulating on separate property, would become community property after the parties' fifth wedding anniversary.  *See id.*; *Bufkin v. Bufkin*, No. 08-02-00025-CV, 2003 WL 22725522 (Tex. App.—El Paso Nov. 20, 2003, pet. denied) (mem. op.) (*Bufkin I*).  There were four assets at issue in the jury trial of Celmer and Bufkin's divorce:  a residence in Dallas County, a ranch in Oklahoma, shares of stock in Campeon Pipeline Corporation, and shares of stock in Norgasco, Inc.

McGarry represented Celmer in both *Bufkin I* and *Bufkin II*, as will be explained in more detail below.  Although McGarry and Celmer had entered into a written contingency fee contract before *Bufkin I*, McGarry's claims were not based on this contract, but rather on a series of e-mails he later exchanged with Celmer.  The written contingency fee contract, dated December 5, 2001, provided, "In compensation for Attorney's services, Client agrees to pay Attorney a fee equal to the greater of:  (a) forty five percent (45%) of Client's interest in the Norgasco stock or the proceeds or settlement thereof; or (b) fifty percent (50%) of Client's interest in the Norgasco stock or the proceeds or settlement thereof, if any filing is made in the Supreme Court of Texas in this case."  McGarry contends that the parties later agreed by e-mail that his contingency fee would no longer be limited to Celmer's interest in the Norgasco stock; instead, he would be

---

[1] Many of the relevant documents refer to Celmer as "Elizabeth Bufkin," but the trial court's judgment and the appellate briefs refer to appellant as "Elizabeth W. Celmer," as do we.

entitled to 50% of Celmer's total recovery, plus $200 per hour for his services, plus expenses. The difference is significant because at the second trial of Celmer's divorce, the jury's findings resulted in a judgment awarding nothing to Celmer for her interest in the Norgasco stock, but awarding her $367,095.62[2] for her interest in other assets. This is the amount interpleaded by Celmer's former spouse in this action.

The jury in this case found that McGarry and Celmer intended to be bound by an agreement for McGarry to receive 50% of Celmer's total recovery, an additional $200 per hour for his services, and reimbursement of expenses. Because we conclude that the evidence was insufficient to support this finding, we reverse the trial court's judgment in part and render judgment for McGarry.

## II. ISSUES

Celmer presents five issues.[3] First, she contends there is no evidence of an enforceable contingency fee agreement which provided for 50% of her total recovery, plus $200 per hour for McGarry's services, plus expenses, and no evidence of any breach of contract to support the trial court's judgment. Second, she contends in the alternative that the judgment for breach of contract is against the great weight and preponderance of the evidence. Third, she contends that the trial court's judgment awards excessive damages unsupported by the evidence. She also argues that McGarry should forfeit any fees owed because of his breaches of fiduciary duty. Fourth, she argues that the trial court erred in dismissing her claim for tortious interference. And fifth, she contends that the trial court abused its discretion by striking her third amended petition and claim for breach of fiduciary duty.

---

[2] The interpleaded funds consisted of a judgment amount of $302,010.00 and $65,085.62 in post-judgment interest.

[3] McGarry states in his brief that although he "perfected a cross-appeal and alleges that the trial court erred in addressing the issue on which it granted the remittitur, he is not asking this Court to change the judgment."

–3–

# III. ANALYSIS

## A. SUFFICIENCY OF THE EVIDENCE

In her first issue, Celmer contends there is no evidence of an enforceable contingency fee agreement which provided for 50% of her total recovery, plus $200 per hour for McGarry's services, plus expenses. She argues that therefore there is no evidence of any breach of contract to support the trial court's judgment.

### 1. Facts

To establish a contract between the parties for a 50% contingency fee plus $200 per hour for his services, plus expenses, McGarry relies on a series of e-mails he exchanged with Celmer in May, 2004. This exchange occurred after Celmer prevailed in her first appeal arising out of the divorce litigation. *See generally Bufkin I*, 2003 WL 22725522. McGarry represented Celmer in *Bufkin I*, under the terms of the parties' 2001 written contingency fee agreement (the First Agreement). Although Celmer did not recover any money as a result of the first appeal, the court of appeals interpreted the prenuptial contract between Celmer and her spouse to allow her to assert a claim for certain increases in value in the Norgasco stock. *Id.* at *5–6; *see also Bufkin II*, 259 S.W.3d at 349 (describing El Paso court's ruling). The El Paso court remanded the case "for a just and right property division" of not only the Norgasco stock but also the entire community estate.

#### a. First Agreement

The First Agreement provided that "[i]f Attorney is successful in obtaining a new trial, Attorney will not represent Client in the trial court, but will assist Client in obtaining new trial

–4–

counsel."[4]  Any fee to McGarry, however, would only be due and paid if Celmer received any recovery for her interest in the Norgasco stock after the new trial.  The First Agreement expressly stated, "[n]o contingent fee shall be payable to Attorney if no recovery is received by Client in this matter."

### b.  Claimed Second Agreement

McGarry relies on a series of four e-mails to establish a second agreement.  He contends that this second agreement entitles him to 50% of Celmer's total recovery plus $200.00 per hour for his services, plus expenses.  These e-mails were exchanged in 2004, after the El Paso Court of Appeals remanded the case for new trial to give Celmer the opportunity to prove her claims to the community estate. *See Bufkin I,* 2003 WL 22725522, at \*6.

On May 14, 2004, in Plaintiff's Exhibit (PX) 5, Celmer wrote[5] the first of the e-mails to McGarry on which he relies:

> In reference to our original contract, I believe the addendum is required for us to sign to clarify the situation with the progress of our case and cost involved.
>
> In the original contract you state that you will not represent me in a trial.  However that has changed.  You want to do it yourself with the consultant divorce attorney on board associated with the Court 330.  That is necessary for us to cover all grounds, politically and by law.
>
> We need to address further, that any additional costs to proceed with our case have to be split among us 50%/50% from the top of our portion of proceeds received by us.  We both have the same steak at the case.  We should limit sharing the proceeds with anyone else, unless is absolutely necessary like a divorce attorney practicing well with the 330 court.
>
> According to my understanding of the situation and the original contract at this time I owe you 45% of proceeds from the case for

---

[4]  The First Agreement also provided that Celmer was responsible for payment of expenses, and that she was to pay $500 per month to be used to offset expenses.  The evidence showed that Celmer paid $1000 to McGarry under this provision, but did not make further payments, supporting the jury's finding in response to Question 1 that she breached the First Agreement.  Celmer does not challenge this finding on appeal.

[5]  The record shows that Celmer is a native of Poland and that English is not her first language.  We quote her e-mails verbatim.

winning the appeal plus the expenses you have incurred so far listed on your invoice. I believe it is very fair for you to receive additional 5% of the proceeds to represent us at the divorce court, as you would have received, if representing me at the Supreme Court.

Within the hour on the same day, McGarry replied (PX6):

You're right that we need to work something out . . . . I took another look at our existing agreement, and you are right that it did not contemplate me representing you further in the trial court. So you are free to choose your attorney at this point. I believe I know the issue involved very well and can prove it as well as anyone.

Our existing agreement went to 50% when the case was filed in the supreme court. I do not believe it is right or fair to you to seek any additional percentage. In fact, since the appeal has been won, it is probably unethical for any lawyer to ask for a percentage for the new trial. So I think a deferred hourly rate is the only fair option for you. This would be true both for my additional work and for any new lawyer.

The existing contract also called for you to cover the out-of-pocket expenses. However, you were never able to do that. In the trial court, there will be many thousands of dollars in expenses incurred for various expert witnesses. So, unless you have the finances available, you will have to either find someone to loan it to you, or get me to finance it.

Either way, you have to realize at this point, you are going to end up with less than 50%, because the expenses and new hourly fees would come out of your 50% . . . .

Please think this over and let me know how you want to proceed. You probably have a couple of weeks to make a decision.

And, later on the same day, Celmer replied (PX 7):

OK draw the agreement as you see fit based on what you have said. Agreement is an Agreement and I owe you 50% up to this point plus expenses.

50% of nothing leaves nothing.
We have to win to get paid anything.
What is the hourly fee for you and Mr. H [an attorney McGarry had recommended] . . . .
You would be a main attorney is that right?

It makes sense for you to make money not anybody else in this case. I am not sure why you have said in a contract that you would not represent me in a trial . . . .

In July 2004, Celmer retained another attorney, Joe Amberson, to represent her pursuant to a written fee agreement. On July 9, 2004, Celmer wrote the fourth e-mail on which McGarry relies (PX 8):

I did not miss understood anything about lead counsel.

I believe that you would be very much involved as a co-counsel in strategy and research of any issues not addressed by the auditor as Joe Amberson suggested. You may decide that you make want to write pleadings or documents as you choose to our benefit. It is up to you and he to decide what would be a part for each of you to play.

The message continued with Celmer's assurances that McGarry should be consulted about decisions on strategy and on his own role in the case, "as you [have] more portion to lose than me." She then asked, "What is this all about? What are we discussing over and over and over." She explained, "Joe Amberson came with the highest recommendations as a [trial] lawyer in the 330 divorce court where we are. That is good enough for me. I believe this is only a win, win, win situation for three of us." She concluded, "I will be happy to sign another contract with you and whatever work you will decide to do in my case for us you can bill me accordingly at the rate of $200.00 per hour. Your fees have to be paid after final distribution of proceeds as Joe Amberson's will too."

In addition to the e-mails, McGarry also relies on his own testimony at trial to support his position that the parties agreed to expand the contingency fee to include all assets, not only the Norgasco stock:

And so if I'm going to finance all of these experts to appraise all of these pieces of property, then the deal, the 50 percent – and I told her it was 50 percent and not because it had gone to the Supreme Court. *But the 50 percent was going to have to apply to everything* because, you know, why would I finance, you know, her recovery

–7–

out of these other pieces of property if I had no interest in them. (Emphasis added).

He also testified:

> Q.  Okay.  You said that it was more likely than not that there was not a second written agreement.
>
> A.  I think that's my own personal conclusion, that – because I sent e-mails to your client [Celmer] saying, no, you know, we might have just exchanged e-mails and made our agreement that way. You know, that's entirely possible.  And, certainly, that's the only evidence of the agreement I have been able to locate after getting your client's records.

Additionally, McGarry also relies on Plaintiff's Exhibit 12, an e-mail dated March 2, 2009, five years after the alleged second agreement.  McGarry contends, "[t]hat e-mail states unequivocally that they had signed a second fee agreement when Amberson withdrew, and that McGarry was to get a contingent fee of fifty percent of the assets, plus an hourly fee of $200 per hour, plus his expenses."  In this e-mail, Celmer writes in part,

> Charles there was a second written letter agreement related to you taking on as a divorce attorney after we discussed that you were to be involved and when Jo [Amberson] withdrew for duplication of attorney purposes:  $200 per hour is what we have agreed as you state, plus cost incurred by you related to my trial, if the cost was not paid to the experts there would not be any assets nor trial to win nor loose. . . .
>
> Jo Amberson did not care to pay for anything so that is why you stepped in since the huge portion of 50% of the asset was to be awarded to you only for the appeal it was over a million dollar case.
>
> You had the same steak or then some at that time in my case.
>
> Cost was listed on the billings I have received.  You have confirmed being about 26K hard cost.
>
> We need to have theses documents present before I can have a feel for the numbers.  I have signed both instruments at your office or faxed it to you, either way.
>
> These are 2 instruments we have ever signed related to my case and you being paid, and you would base your calculation on:

> 1: Appellate
> 2. Rate of $200/HR as my divorce attorney
> 3. Hard cost. 26K
>
> So at this time my understanding is you have calculated all proposals from your memory since no letters can be located.
>
> I have a photographic memory in general, but I would be hesitant to recall anything especially nuances if any in this important matter involving a lot of money.
>
> I doubt your memory is perfect that is why we sign papers in such cases, so there is no misunderstanding. You would not get involved without such agreements.
>
> I would appreciate your checking your records for these. We need these ASAP!

Celmer contends this e-mail shows that in 2009, she had an incorrect recollection that she and McGarry had entered into a second written agreement in 2004. She emphasizes that despite her claim of a "photographic memory," she clearly stated that she "would be hesitant to recall anything . . . in this important matter involving a lot of money," and asks McGarry to find the actual written agreement. She argues that the e-mail does not confirm an expansion of the 50% from her interest in the Norgasco stock to her entire recovery, pointing to her reference to "the asset" in the singular. And Celmer testified at trial that the parties never agreed to any percentage other than 50% of her portion of the increase in value of the Norgasco stock in the First Agreement.

### c. Results of Second Divorce Trial

McGarry remained involved in the case during the time Amberson represented Celmer. After Amberson withdrew as Celmer's counsel in July 2005, McGarry acted as lead counsel and tried the case before a jury. The jury made findings regarding the value of specific assets including the Norgasco stock. *See Bufkin II*, 259 S.W.3d at 349. But because of the jury's findings regarding the value of the Norgasco stock, Celmer was not awarded any amount for the Norgasco stock in the divorce decree.

McGarry also represented Celmer in her ex-spouse's appeal of the 2006 decree to this Court. We concluded in that appeal that the trial court's award of prejudgment interest in the amount of $124,659.12 to Celmer was improper. *Id.* at 347, 350, 356–58. We affirmed the remainder of the trial court's judgment. *Id.* at 358.

### 2. Standard of Review

When an appellant attacks the legal sufficiency of the evidence to support an adverse finding on an issue on which she did not have the burden of proof, she must demonstrate there is no evidence to support the adverse finding. *See Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983). In evaluating the legal sufficiency of the evidence to support a finding, we must determine whether the evidence as a whole rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005); *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 519 (Tex. 2002). We sustain a no-evidence point only if there is no more than a scintilla of evidence proving the elements of the claim. *St. Joseph Hosp.*, 94 S.W.3d at 520. In making this determination, we must view the evidence in the light favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *City of Keller*, 168 S.W.3d at 807.

### 3. Applicable Law

#### a. Requirements of Contract

Whether McGarry and Celmer intended to enter into an enforceable written contract was a question of fact for the jury. *See Scott v. Ingle Bros. Pac., Inc.*, 489 S.W.2d 554, 554–56 (Tex. 1972). The court in *Scott* explained, "[a] transaction is complete when the parties meant it to be complete. It is a mere matter of interpretation of their expressions to each other, a question of fact." *Id.* (quoting 1 CORBIN ON CONTRACTS 87–91 (1963)). Parties may agree upon some of the

terms of a contract, and leave other portions to be made later. *Id.* at 555. Binding obligations may arise from an informal agreement even if the parties intended to draw up a more formal written agreement but never did so. *Id.* at 556 (quoting 17 AM. JUR. 2D *Contracts* § 28). But before a contract may be enforced, the parties must agree on the material terms. *T.O. Stanley Boot Co., Inc. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992). The parties must agree to the same thing, in the same sense, at the same time. *Weynand v. Weynand*, 990 S.W.2d 843, 846 (Tex. App.—Dallas 1999, pet. denied). The party seeking to enforce the contract bears the burden of proving the existence of the contract and its terms. *Calce v. Dorado Exploration, Inc.*, 309 S.W.3d 719, 737 (Tex. App.—Dallas 2010, no pet.). And whether a contract is too indefinite to be enforced is a question of law to be determined by the court. *Fiduciary Fin. Servs. of the Sw., Inc. v. Corilant Fin., L.P.*, 376 S.W.3d 253, 256 (Tex. App.—Dallas 2012, pet. denied).

Additionally, a contingent fee contract for legal services must be in writing and signed by the attorney and client. TEX. GOV'T CODE ANN. § 82.065(a) (West Supp. 2012); *see also* TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 1.04(d), *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit. G, app. A (West Supp. 2012) (hereinafter cited "D.R.") (a contingent fee agreement "shall be in writing and shall state the method by which the fee is to be determined").

### b. Preservation of Issue for Appeal

McGarry urges that Celmer has waived the complaint that the evidence was insufficient because the jury charge did not include any instructions regarding section 82.065(a) or D.R. 1.04, and Celmer failed to object to the charge on this basis. We disagree. Although the jury could determine the parties' intent, it could not resolve the question of whether the series of e-mails met the legal requirements for an enforceable contingency fee contract. *See Parker Drilling Co. v. Romfor Supply Co.*, 316 S.W.3d 68, 72 (Tex. App.—Houston [14th Dist.] 2010,

–11–

pet. denied) (whether parties reached agreement is question of fact; whether agreement is legally enforceable is question of law). Celmer preserved this issue in her motion for new trial. *See DeAtley v. Rodriguez*, 246 S.W.3d 848, 850 (Tex. App.—Dallas 2008, no pet.) (one way to preserve error for no evidence or matter of law point is through motion for new trial).[6] In addition, Celmer filed a motion to disregard the jury's findings and motion for remittitur and requested judgment in her favor. *See Horrocks v. Tex. Dep't of Transp.*, 852 S.W.2d 498, 499 (Tex. 1993) (per curiam) (for appellate court to render judgment after sustaining complaint as to legal sufficiency of evidence, party must request that relief).

### 4. Application of Law to Facts

#### a. E-Mails as the Second Agreement

The jury was instructed that "[i]f a law requires a record to be in writing, an electronic record satisfies the law," as long as the parties have "agreed to conduct transactions by electronic means." The jury was also instructed that "[w]hether the parties agree to conduct a transaction by electronic means is determined from the context and surrounding circumstances, including the parties' conduct." *See* Uniform Electronic Transactions Act, TEX. BUS. & COM. CODE ANN. §§ 322.001–.021 (West 2012).

McGarry contends that the parties' e-mails satisfied the requirement that the contract must be in writing. We disagree. In the e-mails on which McGarry relies as proof that he and Celmer entered into a contract, Celmer requested a writing rather than agreeing "to conduct transactions by electronic means." *See id.* And her e-mails contain her repeated emphasis on the necessity of a writing. In PX 5, she states, "I believe the addendum is required for us to sign to

---

[6] We note that Celmer did not cite to section 82.065(a) of the Texas Government Code in her motion for new trial or her motion to disregard jury findings, although she raised it in her pretrial motion for summary judgment and in her appellate brief. However, her complaint that the series of e-mails did not constitute a written contingency fee agreement meeting the requirements of D.R. 1.04 as a matter of law was sufficiently specific to advise the trial court of the grounds of her objection. *See* TEX. R. APP. P. 33.1(a) (to preserve error for appeal, party must state grounds for desired ruling "with sufficient specificity to make the trial court aware of the complaint").

clarify the situation with the progress of our case and cost involved." In PX 7, she states, "OK draw the agreement as you see fit based on what you have said." In PX 8, she states, "I will be happy to sign another contract with you and whatever work you decide to do in my case for us you can bill me accordingly at the rate of $200.00 per hour." Four years later, even when she recalled that she had signed a contract, she cautioned, "I have a photographic memory in general, but I would be hesitant to recall anything especially nuances if any in this important matter involving a lot of money. I doubt your memory is perfect that is why we sign papers in such cases, so there is no misunderstanding . . . . I would appreciate your checking your records for these." (PX 12). Consequently, the evidence as a whole does not rise to a level that would enable reasonable and fair-minded people to differ in their conclusions regarding whether Celmer agreed to conduct transactions by electronic means. *See City of Keller*, 168 S.W.3d at 822.

### b. Terms of Agreement

But even if the e-mails were sufficient to constitute a written agreement, that written agreement nowhere states that McGarry's contingency fee will be expanded to include Celmer's entire recovery rather than only her interest in the Norgasco stock. At trial and in his brief, McGarry emphasized that limiting the first appeal to the Norgasco stock was necessary for there to be any appeal at all. Because she was awarded nothing "but her clothes and personal effects" in the first trial, Celmer could not afford the costs associated with appealing the entire case. She and McGarry both believed that the Norgasco stock was the most valuable of the assets at issue and provided the best chance of a monetary recovery to her. Nothing in the e-mails alters this understanding, embodied in the parties' written agreement that McGarry would receive "fifty percent (50%) of Client's interest in the Norgasco stock or the proceeds or settlement thereof." At most, McGarry clarified that the percentage under the parties' original contingency fee

–13–

contract had risen from 45% to 50% because of the proceedings in the Texas Supreme Court, and Celmer acknowledged the increase. At the same time, McGarry stated he did "not believe it is right or fair to you to seek any additional percentage." And although McGarry testified at trial that he explained to Celmer "the 50 percent was going to have to apply to everything," neither the e-mails nor the testimony at trial establish an agreement in writing that states "the method by which the fee is to be determined." *See* D.R. 1.04. There is no further e-mail correspondence in 2004 about a new writing, its execution, or negotiation of its terms. There is nothing reflecting an expansion of the contingency fee the parties agreed to in 2001.

McGarry also relies on later e-mails to indicate that Celmer understood that she was to pay McGarry 50% of her entire recovery. In a 2007 e-mail written after the second trial, Celmer stated, "I am aware that I owe you 50% of the recouped assets for the 1st appeal and the additional divorce fees." In another e-mail, she wrote, "Of course $150K plus your fees is a great number for you now . . .", an amount that is approximately half of the jury's award of $302,010 at the retrial. She also stated in the 2009 e-mail that McGarry had "the same [stake]" in the case as she did. But Celmer's subjective belief about terms of a purported second agreement several years after it was allegedly formed is not evidence of a meeting of the minds sufficient to constitute an agreement that McGarry would receive 50% of Celmer's entire recovery, plus $200 per hour for his services, plus expenses. *See Weynand*, 990 S.W.2d at 846 (parties must agree to same thing, in same sense, at same time); *Paciwest, Inc. v. Warner Alan Props., LLC*, 266 S.W.3d 559, 567–68 (Tex. App.—Fort Worth 2008, pet. denied) (determination of whether meeting of minds has occurred is based on objective standard; evidence of party's subjective belief of what contract says or whether an amendment occurred is not relevant to whether there was meeting of minds sufficient to amend contract).

### c. Lost Agreement

The dissenting opinion concludes that there was legally and factually sufficient evidence that a second written contingency fee agreement was entered into by the parties but was lost. The dissent relies on *Chakur v. Zena*, 233 S.W.2d 200, 202 (Tex. Civ. App.—San Antonio 1950, no writ), and *EP Operating Co. v. MJC Energy Co.*, 883 S.W.2d 263, 267 (Tex. App.—Corpus Christi 1994, writ denied), for the proposition that the contents of a lost memorandum sufficient to satisfy the statute of frauds may be proved by clear and convincing evidence. Assuming this standard applies, and that McGarry even raised this argument on appeal,[7] we do not agree that McGarry met the burden of proving the terms of a lost written contingency fee agreement by clear and convincing evidence.

The standard relied upon in the dissent, clear and convincing evidence, is that "measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Vardilos v. Vardilos*, 219 S.W.3d 920, 921–22 (Tex. App.—Dallas 2007, no pet.) (quoting TEX. FAM. CODE ANN. § 101.007). This standard falls between the preponderance of the evidence standard of civil proceedings and the reasonable doubt standard of criminal proceedings. *Id.* at 922. When the burden of proof at trial is by clear and convincing evidence, we apply a higher standard of legal sufficiency review. *Id.* at 921. As we explained in *Vardilos*, "the proof must weigh more heavily than merely the greater weight of the credible evidence, but it need not be unequivocal or undisputed." *Id.* at 922.

---

[7] McGarry argues in his brief that a contingency fee agreement may be proven by oral testimony and the document itself need not be located, citing *VingCard A.S. v. Merrimac Hospitality Sys., Inc.*, 59 S.W.3d 847, 869–70 (Tex. App.—Fort Worth 2001, pet. denied). But the *VingCard* case is neither a statute of frauds case nor a "lost agreement" case. The *VingCard* court concluded that an attorney's testimony of his fees was sufficient to comply with the *Arthur Andersen* factors. *See Arthur Andersen & Co. v. Perry Equip. Co.*, 945 S.W.2d 812, 818 (Tex. 1997) (setting out factors for proof that an attorney's fee is reasonable and necessary). The court also noted that evidence of a contingency fee percentage alone was insufficient; the attorney must prove that the fee was both reasonably incurred and necessary to the prosecution of the case. *VingCard*, 59 S.W.3d at 869. The court did not discuss proof of lost agreements, nor did it conclude that a contingency fee agreement need not be in writing as long as an attorney testifies as to its terms. *See id.* We disagree that by citing *VingCard*, McGarry raised any argument that a second written contingency fee agreement with Celmer existed but was lost.

–15–

McGarry testified, obtained a jury issue, and argued on appeal that the second contingency fee agreement was made by e-mail. Although McGarry testified on direct examination that his "initial recollection" was that he and Celmer had signed a second written fee agreement, he stated on cross-examination that it is "more likely than not" that there was no formal second agreement. He explained instead that he and Celmer most likely made the second agreement by exchanging e-mails. In response to a question whether he prepared a second fee agreement like the first one he and Celmer had executed, he answered:

> I cannot answer that clearly yes or no. My recollection was that I did. Her recollection was that I did. I have no record of it currently, and despite my requests to [Celmer], I have not been able to locate one. *And so I have concluded—or it is my belief that it is more likely than not that there wasn't a second written agreement and that we are both mistaken.* But I can't categorically say that because, as I said, we both remembered that there was. It just hasn't shown up. (Emphasis added.)

In addition, McGarry emphasized in his testimony that he was relying on the e-mails, not the terms of a lost agreement, as proof:

> Q. Are you required under Rule 1.04 [of the Disciplinary Rules] to have a written fee agreement with your client if it is a contingency fee agreement?
>
> A. Yes.
>
> Q. And you have, I'm assuming, searched extremely diligently through whatever records you have obtained and been unable to find a second, written agreement?
>
> A. Well, no because e-mails are in writing. They do constitute writings as a matter of law. And the printed names at the bottom constitute signatures as a matter of law.

Additionally, and even if this testimony constituted clear and convincing evidence that a written contingency fee agreement existed but was lost, McGarry did not prove by clear and convincing evidence a material term of the contract, that is, the expansion of the contingency agreement to 50% of Celmer's total recovery. McGarry's testimony that "[w]e changed the

–16–

original agreement" to "50 percent of everything" is the only evidence of this material term. There is no writing reflecting it. None of McGarry's own e-mails to Celmer either in 2004 or after explain that the contingency fee will be expanded to encompass her total recovery rather than only the Norgasco stock. Celmer's own e-mails, quoted at length above and in the dissenting opinion, at most establish that Celmer believed, several years after the fact, that a second written agreement had been signed. There is no statement or acknowledgement that Celmer ever agreed, either orally or in writing, to pay McGarry "50 percent of everything" rather than 50 percent of the Norgasco stock. In contrast, there are several references in her e-mails to her willingness to pay McGarry $200 per hour plus expenses. But the e-mails do not contain any unequivocal reference to an expanded contingency fee. Consequently, on this record, we conclude that the jury could not form "a firm belief or conviction" that Celmer agreed in writing to pay McGarry an expanded contingency fee. *See id.* at 921–22.

### d. Conclusion

We conclude that the evidence was legally insufficient to support the jury's finding, in response to Question 2, that McGarry and Celmer intended to be bound by an agreement for McGarry to receive a contingent fee equal to 50% of Celmer's total recovery, plus an hourly fee equal to $200 per hour for his services, plus reimbursement of expenses. We sustain Celmer's first issue. Because we have sustained Celmer's first issue, we need not consider her second issue regarding the factual sufficiency of the evidence to support the jury's verdict.

## B. DAMAGES

In her third issue, Celmer contends that the trial court's judgment awards excessive damages unsupported by the evidence. She argues that because there was no enforceable contingency fee contract, McGarry's damages should be limited to the jury's award of quantum meruit damages. Celmer also argues in the alternative that the trial court's judgment

"improperly enforces an unconscionable agreement." She contends that McGarry's fees "should be forfeited for multiple breaches of fiduciary duty." Celmer also complains that the trial court erred by calculating McGarry's damages based on Celmer's gross recovery, rather than a net recovery that subtracted the expenses found by the jury.[8]

### 1. Excessiveness of Damages for Claimed Breach of Second Agreement

Because we have concluded that the evidence was legally insufficient to support the jury's finding that there was a new contract in 2004, we also conclude that there is no evidence to support the jury's award of damages for breach of that contract in response to Question 6 of the jury charge. *See, e.g., Hall v. Hubco, Inc.*, 292 S.W.3d 22, 28 (Tex. App.—Houston [14th Dist.] 2006, pet. denied) (where court of appeals concluded there was no contract as matter of law, jury's damages award for breach of the alleged contract was stricken from judgment). As a result, we need not consider Celmer's arguments about the excessiveness of the damages in response to Question 6, or the excessiveness of the damages awarded in the judgment after the trial court's suggestion of remittitur of a portion of the damages awarded by the jury in response to Question 6.

### 2. Fee Forfeiture

Celmer argues that any fee should be forfeited because McGarry breached his fiduciary duty or because the agreement was unconscionable. Although the jury was not asked any questions about unconscionability or breach of fiduciary duty, the trial judge suggested a remittitur of a portion of the jury's damage award after a discussion of unconscionability and breach of fiduciary duty at the post-trial hearing on McGarry's motion for judgment. At the hearing, the trial court noted that "this second agreement [the 2004 agreement found by the jury]

---

[8] In light of our disposition of the previous issue, we do not consider this complaint further, as it is relevant only to calculation of a contingency fee award.

–18–

was entered into either during or at least after the existence of an attorney-client relationship between Mr. McGarry and Ms. Celmer." The trial court then entered judgment on the jury's verdict subject to a suggestion of remittitur "sufficient to reduce the total actual damages to an amount equal to one half of the amount of the interpleader." The trial court stated that "the basis for the remittitur is the Court's conclusion that any fee in excess of one half of the total recovery would be unconscionable; and that the burden on that issue was on Mr. McGarry, and that he has waived his right to have the jury make that determination."[9] Consequently, the trial court determined that the fee in excess of one-half of the total recovery was unconscionable, but impliedly concluded that forfeiture of the entire fee was not appropriate.

### a. Standards of Review: Fee Forfeiture and Unconscionability

We review a trial court's fee forfeiture determination under an abuse of discretion standard. *Miller v. Kennedy & Minshew, P.C.*, 142 S.W.3d 325, 339 (Tex. App.—Fort Worth 2003, pet. denied). A trial court does not abuse its discretion unless it acts arbitrarily or unreasonably, without reference to any guiding rules or principles. *Id.* Legal and factual sufficiency are relevant factors to be considered in assessing whether the trial court abused its discretion. *Id.* An abuse of discretion does not occur, however, where the trial court bases its decisions on conflicting evidence, as long as some evidence reasonably supports the trial court's decision. *Id.* (citing *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 211 (Tex. 2002)).

A determination of unconscionability involves both questions of law and questions of fact. *See Hoover Slovacek LLP v. Walton*, 206 S.W.3d 557, 561–62 (Tex. 2006) (whether particular fee amount or contingency percentage charged by attorney is unconscionable under all relevant circumstances of the representation is an issue for the factfinder; but whether a contract,

---

[9] In making these determinations, the trial court necessarily disregarded the jury's answer to Question 3, in which the jury found that there was no attorney-client relationship between McGarry and Celmer at the time they entered into the alleged second agreement. We agree with the trial court.

–19–

including a fee agreement between attorney and client, is contrary to public policy and unconscionable at the time it is formed is a question of law); *Pony Express Courier Corp. v. Morris*, 921 S.W.2d 817, 820 (Tex. App.—San Antonio 1996, no writ) ("procedural" unconscionability focuses on "the facts surrounding the bargaining process," while "substantive" unconscionability "is concerned with the fairness of the resulting agreement"). We review the trial court's decision regarding unconscionability for an abuse of discretion. *Id.* In applying this standard, we defer to the trial court's factual determinations while reviewing its legal conclusions de novo. *Id.*

A trial court may properly disregard a jury's finding of fact where the evidence supporting the finding is legally insufficient. *Bufkin II*, 259 S.W.3d at 353. Evidence is legally insufficient where (1) there is a complete lack of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla; or (4) the evidence conclusively establishes the opposite of a vital fact. *Id.*

### b. Applicable Law: Fee Forfeiture

Whether a particular fee amount or contingency percentage charged by the attorney is unconscionable under all relevant circumstances of the representation is an issue for the factfinder. *Hoover Slovacek LLP*, 206 S.W.3d at 561–62. On the other hand, whether a contract, including a fee agreement between attorney and client, is contrary to public policy and unconscionable at the time it is formed is a question of law. *Id.* A fee is unconscionable under the disciplinary rules "if a competent lawyer could not form a reasonable belief that the fee is reasonable." D.R. 1.04(a). "Contracting for a contingent fee in combination with an hourly fee does not in and of itself violate DR 1.04." Tex. Comm. on Prof'l Ethics, Op. 518, 59 TEX. B.J.

795, 796 (1996). But "the total fee to be paid under such arrangement" must be "reasonable, considering all of the factors set out in DR 1.04." *Id.*

Because a lawyer's fiduciary duty to a client covers contract negotiations between them, such contracts are closely scrutinized. *Anglo-Dutch Petroleum Int'l, Inc. v. Greenberg Peden, P.C.*, 352 S.W.3d 445, 450 (Tex. 2011). A presumption of unfairness or invalidity attaches to these contracts because the relationship between attorney and client is fiduciary in nature. *Keck, Mahin & Cate v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 20 S.W.3d 692, 699 (Tex. 2000). The burden is on the attorney to establish that the contract is fair and reasonable. *Id.* The presumption does not arise if the attorney-client relationship has been severed before the agreement is made. *Id.* at 699 n.3.

Lawyers have a duty, at the outset of the representation, to "inform a client of the basis or rate of the fee" and "the contract's implications for the client." *Hoover Slovacek LLP*, 206 S.W.3d at 565. The decision whether to forfeit an attorney's fee is initially that of the trial court. *Wythe II Corp. v. Stone*, 342 S.W.3d 96, 105 (Tex. App.—Beaumont 2011, pet. denied) (citing *Burrow v. Arce*, 997 S.W.2d 229, 246 (Tex. 1999)), *cert. denied*, 132 S. Ct. 1150 (2012). The trial court's primary consideration is "whether forfeiture is necessary to satisfy the public's interest in protecting the attorney-client relationship." *Id.* (quoting *Burrow*, 997 S.W.2d at 246). Forfeiture may not be required if the trial court may reasonably conclude that the actions of the attorney did not affect the value of the lawyer's work for the client or harm the client. *See id.*

### c. *Application of Law to Facts*

Although the First Agreement provided that McGarry would not represent Celmer in the trial court if he was successful in obtaining a new trial, it also provided that "Attorney . . . will assist Client in obtaining new trial counsel." The written agreement under which McGarry was representing Celmer (that is, the First Agreement) explicitly provided for the very services

–21–

McGarry was rendering through the e-mails exchanged in 2004. The trial court correctly concluded that the 2004 negotiations were undertaken during the existence of an attorney-client relationship. Consequently, a presumption of unfairness arose and McGarry bore the burden to establish that the agreement was fair and reasonable. *See Keck*, 20 S.W.3d at 699.

We also agree with the trial court that Celmer pleaded unconscionability and breach of fiduciary duty as defenses to McGarry's claims, and we reject McGarry's other arguments that Celmer failed to preserve error.[10] Although McGarry correctly states that Celmer's third amended cross-claim containing an affirmative claim for damages for breach of fiduciary duty was struck by the trial court (as we discuss in response to Celmer's fifth issue below), her answer to McGarry's first amended cross-claim, the operative pleading at trial, included this defense. Celmer also pleaded that "the attorney's fees that McGarry seeks to recover are excessive, unreasonable and unconscionable and should therefore be denied in whole or in part." In addition, Celmer's motion for new trial complained that the fee awarded in the trial court's judgment was unconscionable; that the jury's answer to Question 7 (the predicate for a quantum meruit finding) was "against the great weight and preponderance of the evidence and is manifestly unjust" and "contrary to law"; and that the judgment improperly included interest and failed to give credit for expense amounts Celmer had paid, among other complaints.

The trial court found the alleged second agreement to be unconscionable and unreasonable to the extent that it required Celmer to pay more than 50% of her total recovery. The trial court also impliedly concluded that forfeiture of McGarry's entire fee was not warranted. These findings were supported by the evidence at trial. McGarry's expert witness

---

[10] McGarry claims that Celmer has waived any complaint of breach of fiduciary duty to support a forfeiture of fees by failing to plead, offer evidence, or request a jury finding on the issue. He also contends that if unconscionability is a question of fact, Celmer waived any complaint by failing to object to the jury charge or submit a jury question, and that if unconscionability is a question of law, any error was cured by the trial court's remittitur.

testified that a contract that called for a 40% contingency fee at trial, a 45% fee for appeal to the court of appeals, and a 50% fee for appeal to the supreme court was reasonable and "fairly standard." McGarry also testified that the $200 hourly fee he charged Celmer was less than his usual hourly fee and was reasonable. But there was no evidence that a combined contingency fee of 50% plus an hourly rate of $200 was fair and reasonable or was in accordance with any written agreement between the parties.[11] The evidence also showed that McGarry's failure to include a request for prejudgment interest in Celmer's pleadings was one basis cited on appeal for a loss to Celmer of $124,659.12 in prejudgment interest that was awarded to her. *See Bufkin II*, 259 S.W.3d at 356–58.

On the other hand, there was evidence that McGarry performed valuable services for Celmer, obtaining a reversal of the original divorce decree, advancing expenses for appeal and retrial, obtaining an award of damages for Celmer on retrial, and obtaining affirmance of the award of damages in his representation of Celmer on appeal. *See, e.g., id.* at 347–56; *Bufkin I*, 2003 WL 22725522 at *1–6. We agree with the trial court that although McGarry failed to establish the reasonableness of the fee he sought under the alleged second agreement, forfeiture of all fees was not warranted. *See Wythe II Corp.*, 342 S.W.3d at 105. We overrule this portion of Celmer's third issue.

### 3. Quantum Meruit Award

We also consider, in light of our conclusion that there was insufficient evidence to support the jury's finding of a second agreement, whether we may render judgment for McGarry based on the jury's quantum meruit findings in response to Question 8. Celmer requested this

---

[11]  The jury's answer to Question 6 awarded McGarry almost 70% of the $367,095.62 Celmer recovered in the trial of her divorce, net of expenses, and was more than twice the amount of the hourly fees and expenses for which McGarry offered evidence at trial.

relief in the alternative in her motion to disregard the jury findings and motion for remittitur. *See Horrocks*, 852 S.W.2d at 499.

Quantum meruit is an equitable remedy that is based upon the promise implied by law to pay for beneficial services rendered and knowingly accepted. *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 740 (Tex. 2005) (quoting *Vortt Exploration Co., Inc. v. Chevron U.S.A., Inc.*, 787 S.W.2d 942, 944 (Tex. 1990), and *Truly v. Austin*, 744 S.W.2d 934, 936 (Tex. 1988)). A party to a contract may seek alternative relief under both contract and quantum meruit theories. *Id.* A party generally cannot recover under quantum meruit, however, when there is a valid contract covering the services or materials furnished. *Id.* (citing *Murray v. Crest Constr., Inc.*, 900 S.W.2d 342, 345 (Tex. 1995), and *Woodard v. Sw. States, Inc.*, 384 S.W.2d 674, 675 (Tex. 1964)). Conversely, where a written contract is unenforceable, a plaintiff is not barred from recovery in quantum meruit. *Angroson, Inc. v. Indep. Commc'ns, Inc.*, 711 S.W.2d 268, 272 (Tex. App.—Dallas 1986, writ ref'd n.r.e.).

### a. For First Appeal

We first consider the jury's award in quantum meruit for the reasonable value for services rendered and expenses advanced through the first appeal. Question 1 of the jury charge asked whether Celmer failed to comply with the parties' 2001 written agreement. The jury was instructed that "[t]he Court has determined as a matter of law that the 2001 Agreement was valid and enforceable, and that McGarry had complied fully with the 2001 Agreement upon the completion of the first appeal." The jury answered that Celmer failed to comply with the agreement, and Celmer has not challenged this finding on appeal. It is also undisputed that Celmer was obligated to pay expenses under the 2001 agreement, and that she paid only $1,000 of the $3,252.42 in expenses incurred. In response to Questions 7 and 8, the jury found that

McGarry performed compensable work of $60,000 in the first appeal, and advanced $2,252.42 in expenses in the first appeal.

But because there was a written contract between the parties regarding McGarry's services through the first appeal, recovery in quantum meruit for these services is not proper. *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d at 740. McGarry argues, however, that because Celmer's breach is undisputed, he may avoid that contract and recover the reasonable value of his services in quantum meruit, citing *Howell v. Kelly*, 534 S.W.2d 737, 739 (Tex. Civ. App.—Houston [1st Dist.] 1976, no writ), and *Willis & Conner v. Turner*, 25 S.W.2d 642, 648 (Tex. Civ. App.—Waco 1930, writ dism'd w.o.j.). We disagree. In *Howell* and *Willis & Conner*, quantum meruit recovery was permitted when the plaintiff had partially performed an express contract but, because of the defendant's breach, the plaintiff was prevented from completing the contract. *See Howell*, 534 S.W.2d at 738–39 (client discharged attorney before work completed); *Willis & Conner*, 25 S.W.2d at 648–49 (same); *see also Truly*, 744 S.W.2d at 936 (recovery in quantum meruit allowed when plaintiff has partially performed an express contract, but because of defendant's breach, plaintiff is prevented from completing the contract; this is exception to rule that plaintiff who seeks to recover reasonable value of services rendered is permitted to recover in quantum meruit only when there is no express contract covering those services).

Here, there is no evidence or contention that Celmer prevented McGarry's completion of the First Agreement. McGarry represented Celmer through the entire appeal, up until the time he contends the First Agreement ended by its terms, when he was "successful in obtaining a new trial." Celmer also points out that McGarry continued to rely on the First Agreement for authority to sign releases on her behalf in 2009. An award of quantum meruit would contravene the express terms of the parties' agreement that McGarry would be paid 50% "of Client's interest

in the Norgasco stock or the proceeds or settlement thereof," and that "[n]o contingent fee shall be payable to Attorney if no recovery is received by Client in this matter." *See Truly*, 744 S.W.2d at 936. However, McGarry proved and obtained a jury finding on Celmer's breach of the First Agreement, and the amount of damages resulting from that breach, that is, Celmer's failure to pay $2,252.42 in expenses, was undisputed. Although Celmer complains that McGarry waived any claim for damages by failing to request a jury finding of damages based on her breach, a jury question was not necessary where the amount of unpaid expenses was conclusively established by the evidence. *See Ritchie v. Rupe*, 339 S.W.3d 275, 284 (Tex. App.—Dallas 2011, pet. granted) (jury questions should not be submitted where facts in question are conclusively established). Consequently, although McGarry may not recover a contingent fee in quantum meruit for breach of the First Agreement, he may recover the $2,252.42 in expenses established by the undisputed evidence for Celmer's breach of the First Agreement.

### b. For Second Trial and Appeal

We have concluded that no express contract existed as a matter of law for McGarry's services in the second trial and appeal. As a result, recovery of the reasonable value of his services as found by the jury is proper. *See Angroson, Inc.*, 811 S.W.2d at 272 (where written contract unenforceable, plaintiff not barred from recovery in quantum meruit). McGarry may also recover his trial and appellate attorney's fees as provided in the judgment. *See id.* (party may recover attorney's fees for valid quantum meruit claim). Consequently, judgment for McGarry is appropriate on the jury's findings of the reasonable value of the work he performed and the expenses he advanced in the second trial and appeal, in the amounts of $67,574.00 and $23,016.14 respectively.

In sum, we sustain Celmer's third issue in part and overrule it in part. We reject Celmer's argument that McGarry should forfeit all fees because of his breaches of fiduciary

duty, but sustain in part her contention that the trial court's judgment awards excessive damages unsupported by the evidence. We conclude that McGarry may recover the expenses established by the undisputed evidence for Celmer's breach of the First Agreement, as well as the amounts found by the jury for the reasonable value of the work he performed and the expenses he advanced for the second trial and appeal.

## C. DIRECTED VERDICT

In her fourth issue, Celmer complains the trial court erred by granting McGarry's motion for directed verdict on her claim for tortious interference. In her operative pleading, Celmer alleged:

> The actions and conduct of McGarry in threatening to garnish the payment to be made by Bufkin to Celmer that allegedly resulted in the filing of an interpleader, the executing of releases that McGarry lacked authority to execute, the scheming and conspiring between McGarry, Bufkin and Bufkin's attorney, Potter, which resulted in the payment of $367,095.62 into the registry of the 101st Judicial District Court constitutes tortuous interference with Celmer's rights under the Second Decree to receive a payment of $367,095.62, the amount jointly calculated by McGarry and Bufkin's attorney, Potter, to be the amount due on March 16, 2009.

McGarry moved for directed verdict on this claim, on the grounds that "there are no damages pled," and "we find no basis in the law for such claim." The trial court granted the motion.

### 1. Standard of Review

The standard of review for a directed verdict is a legal sufficiency or "no evidence" standard of review. *LG Ins. Mgmt. Servs., L.P. v. Leick*, 378 S.W.3d 632, 642 (Tex. App.—Dallas 2012, pet. denied). We described this standard in our discussion of Celmer's first issue.

### 2. Applicable Law

Celmer relies on *COC Services, Ltd., v. CompUSA, Inc.*, 150 S.W.3d 654, 679 (Tex. App.—Dallas 2004, pet. denied), for the elements of a cause of action for tortious interference

–27–

with prospective relations. In *COC Services*, we described the elements of the tort of interference with a prospective relationship as (1) a reasonable probability that the parties would have entered into a contractual relationship; (2) an "independently tortious or unlawful" act by the defendant that prevented the relationship from occurring; (3) the defendant did such act with a conscious desire to prevent the relationship from occurring or knew that the interference was certain or substantially certain to occur as a result of his conduct; and (4) the plaintiff suffered actual harm or damage as a result of the defendant's interference. *Id.*

### 3. Application of Law to Facts

In *Anderton v. Cawley*, 378 S.W.3d 38, 59 (Tex. App.—Dallas 2012, no pet.), we described the fourth element of a tortious interference claim as "actual harm or damages suffered by the plaintiff as a result of the defendant's interference, i.e., the defendant's actions prevented the relationship from occurring." *Id.* (quoting *Tex. Integrated Conveyor Sys., Inc. v. Innovative Conveyor Concepts, Inc.*, 300 S.W.3d 348, 367 (Tex. App.—Dallas 2009, pet. denied)). Here, no relationship was prevented from occurring that caused Celmer damage. Celmer argues that she and Bufkin had "reached an agreement to settle the divorce judgment and agreed to a closing date to exchange funds and execute releases on March 16, 2009." She contends that Bufkin "was under no obligation to voluntarily pay the judgment," and could have required her to "pursue post-judgment discovery and collection with uncertain results." However, Bufkin paid the full amount of the judgment into the registry of the court, and no contractual relationship was prevented from occurring that caused Celmer damage. The court's directed verdict on this issue was proper. *See Leick*, 378 S.W.3d at 642. We decide Celmer's fourth issue against her.

### D. AMENDMENT OF PLEADINGS

In her fifth issue, Celmer contends the trial court abused its discretion when it struck her third amended cross-claim that asserted a claim for breach of fiduciary duty. Celmer included a

claim for breach of fiduciary duty in an earlier pleading, but omitted it in her second amended cross-claim. There is no scheduling order in the appellate record, but the trial court's order granting McGarry's motion to strike Celmer's third amended cross-claim recites that pursuant to the scheduling order entered in the case, the deadline for filing amended pleadings asserting new causes of action was January 29, 2010, and the deadline for completing discovery was March 1, 2010. Celmer's third amended cross-claim was filed on March 19, 2010. At the time the cross-claim was filed, trial was set for May 3, 2010. McGarry moved to strike the pleading on the ground that it asserted new causes of action after the court-imposed pleading deadline. Celmer responded that the causes of action for professional negligence and breach of fiduciary duty had been omitted from her second amended pleading "to create a more positive environment for settlement" prior to mediation. Celmer also argued that the pleading deadlines were extended to March 26, 2010, when the court reset the submission date for McGarry's pending motion for summary judgment.

### 1. Standard of Review

We review a trial court's enforcement of a scheduling order for abuse of discretion. *G.R.A.V.I.T.Y. Enters., Inc. v. Reece Supply Co.*, 177 S.W.3d 537, 542 (Tex. App.—Dallas 2005, no pet.).

### 2. Applicable Law

Rule 63 of the Texas Rules of Civil Procedure governs amendments to pleadings before trial. *See* TEX. R. CIV. P. 63. Leave of court must be obtained to file a pleading after a date set by the trial court in a pretrial order. *Id.* Leave "shall be granted" by the trial court "unless there is a showing that such filing will operate as a surprise to the opposing party." *Id.* A trial court has no discretion to refuse an amended pleading unless (1) the opposing party presents evidence of surprise or prejudice; or (2) the amendment asserts a new cause of action or defense, and is

thus prejudicial on its face, and the opposing party objects to the amendment. *Halmos v. Bombardier Aerospace Corp.*, 314 S.W.3d 606, 622 (Tex. App.—Dallas 2010, no pet.). As we explained in *Halmos*,

> An amendment that is prejudicial on its face has three defining characteristics: (1) it asserts a new substantive matter that reshapes the nature of the trial itself; (2) the opposing party could not have anticipated the new matter in light of the development of the case up to the time the amendment was requested; and (3) the amendment would detrimentally affect the opposing party's presentation of its case.

*Id.* at 623.

### 3. Application of Law to Facts

In his motion to strike, McGarry complained that Celmer's amendment asserted new causes of action. At the hearing on McGarry's motion, the trial court concluded "that the attempt to reinsert additional causes of action supported by the affidavits of late-designated experts is prejudicial" to McGarry. The trial court also noted that even if Celmer had deleted the causes of action in order to facilitate mediation, she had known for several months prior to the date she amended her pleading that mediation had been unsuccessful and the case was not going to settle. The court denied all motions for summary judgment on April 9, 2010, and granted the motion to strike the amended pleading on April 12, 2010. The case proceeded to trial as scheduled in May.

We conclude the trial court did not abuse its discretion. After Celmer amended her pleading to omit the causes of action for professional negligence and breach of fiduciary duty, the issues to be tried all arose out of McGarry's claim that the parties had entered into a revised contingency fee contract. The trial court could have concluded that Celmer's reasserted claims would reshape the nature of the trial from contract to tort and would detrimentally affect McGarry's presentation of his case at trial. *See Halmos*, 314 S.W.3d at 623. Further, Celmer had not conducted any discovery, so McGarry could not have anticipated from the development

of the case that Celmer intended to pursue these claims after she omitted them from her pleading. *See id.* We decide Celmer's fifth issue against her.

## IV. CONCLUSION

Because we conclude that the evidence was legally insufficient to support the jury's finding of an agreement between the parties under which McGarry would receive a contingency fee of 50% of Celmer's total recovery, plus $200 per hour for his services, plus expenses, we sustain Celmer's first issue. We overrule the portion of Celmer's third issue requesting forfeiture of all fees to McGarry, and determine that McGarry may recover damages for expenses advanced in the first appeal and damages in quantum meruit as found by the jury for compensable work performed and expenses advanced in the second trial and appeal. We conclude that the trial court did not err in dismissing Celmer's claim for tortious interference, or by striking her third amended petition, and we overrule her fourth and fifth issues. We affirm the trial court's judgment in part, reverse in part, and render judgment for McGarry in the amount of $92,842.56, plus prejudgment interest. We affirm the awards of attorney's fees, costs, and postjudgment interest in the trial court's judgment.

/Elizabeth Lang-Miers/
ELIZABETH LANG-MIERS
JUSTICE

FitzGerald, J., dissenting

101133F.P05

–31–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

ELIZABETH W. CELMER, Appellant

No. 05-10-01133-CV　　　V.

CHARLES MCGARRY, Appellee

On Appeal from the 101st Judicial District
Court, Dallas County, Texas
Trial Court Cause No. DC-09-3023-E.
Opinion delivered by Justice Lang-Miers.
Justices O'Neill and FitzGerald participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED** in part and **REVERSED** and **RENDERED** in part. We **REVERSE** that portion of the trial court's judgment awarding appellee Charles McGarry the sum of $208,816.37 as actual damages and $13,072.48 as prejudgment interest, and **RENDER** judgment for appellee Charles McGarry in the amount of $92,842.56 and prejudgment interest in an amount to be determined by the trial court. In all other respects, the trial court's judgment is **AFFIRMED**. We **REMAND** this cause to the trial court for the determination of prejudgment and postjudgment interest.

It is **ORDERED** that each party bear its own costs of this appeal.

Judgment entered this 8th day of August, 2013.

/Elizabeth Lang-Miers/

ELIZABETH LANG-MIERS
JUSTICE